### BAHEL *v.* MANNING

1. FIREARMS—NEGLIGENT USE—LIABILITY.

One who snaps a gun, knowing it to be pointed at another person, is guilty of negligence *per se*, and is liable to such person in damages, both at the common law and under the statute (2 How. Stat. §§ 9110–9113) designed to prevent the careless use of firearms, for injuries occasioned by the discharge of the weapon; and it is no defense that he used the ordinary means to satisfy himself that the gun was unloaded, and believed it to be so when he snapped it off.[1]

2. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Whether the plaintiff in such action was guilty of contributory negligence is a question for the jury, where defendant testifies that plaintiff sat in range of the gun, and requested defendant to snap it off, both believing it to be unloaded, and the plaintiff, while admitting having suggested that defendant "try" the gun, further testifies that until defendant took it up to discharge it he was not in its range, and that after it was pointed at him he had no time to protest or get out of the way.

Error to Saginaw; Wilber, J.    Submitted January 12, 1897.    Decided March 10, 1897.

---

[1] Negligence in respect to the use of guns is the subject of a note to *Chaddock* v. *Plummer*, (Mich.) 14 L. R. A. 675.

Case by Charles W. Bahel against Peter J. Manning for personal injuries due to the negligent discharge of a firearm.   From a judgment for plaintiff, defendant brings error.   Affirmed.

*F. E. Emerick* (*J. H. Davitt*, of counsel), for appellant.

*Humphrey & Grant*, for appellee.

LONG, C. J.   This is an action on the case for damages for injuries caused by the defendant's carelessly and negligently discharging a gun, the bullet from which passed through plaintiff's right thigh and hip, permanently disabling him.

It appears that the defendant, at the time of the accident, was a resident of Saginaw, this State, and had gone to Otsego Lake on a hunting trip.   He had formerly lived at that village for some years, and he and the plaintiff were well acquainted.   On the evening of November 13, 1894, the plaintiff, learning that the defendant was at the hotel in the village, called to visit him.   As the plaintiff entered the public room of the hotel, he found the defendant seated in front of a wash-stand on the east side of the room, fixing his gun.   He had taken the stock off and the works out, and was fixing the spring, the barrel of the gun lying across his lap.   The plaintiff became seated near the defendant, when some conversation was had between them in reference to the gun.   During the day the defendant had loaded the gun,—that is, had put a number of loaded cartridges into the magazine,—but had had trouble with discharging some of them.   The gun had twice failed to explode the cartridges during the day, and he took it back to the hotel with the cartridges in the magazine.   He testifies that, before he commenced working on the gun to take it apart, he worked the lever which extracts the cartridges from the gun until it failed to throw out any more cartridges, and then took the gun apart, and it was in that condition when the plaintiff

came in. The parties differ as to the position of the gun and the position occupied by each after the plaintiff came into the room. The plaintiff testified that, after he had spoken to the defendant, he "asked him about the gun, and what was the matter with it, and defendant said the spring was not stiff enough; that it wouldn't set the cartridges off,—meaning the fire. I said, 'Perhaps, if you put a piece of leather under the spring, it will make it so it will stand during the hunting season.' He finally took it apart and put the piece of leather under the spring, and put the spring, with the rest of the works, back into the gun, turned it up like that (indicating), and drew the gun up like that (indicating), and discharged it. * * * The gun was pointed so that when it went off it hit me in the leg." He further testified that the gun was on the defendant's knees, and that he put the works in, and "then it was ready to see if the spring was any stiffer. He just turned it and drew it onto me." On cross-examination he testified that the gun was not pointed at him until the spring was fixed and defendant brought it up to try it. He was asked:

" Did you say anything about trying it?

"*A.* Yes, sir. After he put the leather under the spring, then I told him to try it,—see if he could get it any better.

"*Q.* There was only one way for him to try it?

"*A.* He could try it by raising the hammer and not letting it snap down.

"*Q.* Didn't he do that,—raise it with his thumb?

"*A.* No; he raised the hammer and snapped it, and drew it onto me. I didn't tell him to draw it onto me. I leaned back in my chair. I saw him do this. In order to get away, I had to get forward. It happened so quick I didn't have time to take a second thought. * * *

"*Q.* When you said to him to try it, of course the only thorough way to try that would be to cock the gun, and let it pull the trigger, and let it strike down?

"*A.* But he needn't point it at anybody. * * *

"*Q.* Did you think the gun was loaded?

"*A.* No, sir, I didn't; but I ain't in the habit of point-

ing a gun at anybody, or having it pointed at me, whether it was loaded or not."

The witness further testified that during all the time he was in the room, and up to the time when the gun was snapped off, he was not in range with the muzzle.

The defendant's statement of the affair is that he had been in the woods, and had shot at a deer or two that day, and that the gun had failed to go off; that that evening he was trying to tighten the mainspring; that, when the plaintiff came in, defendant showed him the cartridge which the gun had refused to break, and had only dented the top of it a little; that, after fixing the spring, he was working the hammer, when the plaintiff said, "Snap it off; it won't hurt it;" that he did snap it off, when it went off, and the plaintiff was injured. He testified further that the gun was in the same position from the time he started to work at it until it was discharged; that he believed it was entirely unloaded, and that there was nothing that occurred there that night to indicate that there was anything wrong with the mechanism of the gun; that the lever operated as it usually did when emptying the gun and magazine of the cartridges; that he had no recollection of any change in the plaintiff's position or of his own after the plaintiff sat down there; that the gun pointed in his direction all the time from the time he sat down until it was discharged; that he did not pick it up, raise the hammer and bring it around towards the plaintiff, and then pull it off. The defendant further testified that he supposed he had all the cartridges out of the gun and out of the magazine; that his attention was called to this before the plaintiff came in by a Mr. Callahan, who asked, "Is there anything in that gun?" and defendant told him there was not, and that he said to him, "Do you suppose I would go to work to fix a gun with any loads or cartridges in it?" that he pumped the lever to show him there was not, probably five or six times; that this was the usual way of throwing out the cartridges. It was shown, how-

ever, by the testimony of other witnesses, that, if the cartridge was carried from the magazine to the barrel by working the lever after the works had been put back into the gun, the cartridge would come into plain view of the one working the lever.

The defendant presented several requests to charge to the court, relating to the question of defendant's negligence. These the court refused, but charged the jury upon that question as follows:

"It seems from some cause,—the witnesses are not able to explain just how,—one cartridge was not removed, and the result was this accident. The pointing of the gun, under such circumstances, at another, is made an unlawful act by the statutes of this State. The fact that the defendant had used the precautions which he has enumerated, for the purpose of determining whether the gun was or was not loaded, will not relieve him from liability, from the consequences of his negligent act in pointing the gun at the plaintiff, raising the hammer, and pulling the trigger, which were the immediate acts which caused a discharge of the gun and resulted in injury to the plaintiff. A man is not excused from his act in injuring another by pointing and discharging a gun at him from the fact that he supposed he had taken all necessary precautions prior to the doing of this for the purpose of ascertaining and determining that the gun was not loaded. The act of pointing a gun at another, cocking it, and pulling the trigger, is of itself a negligent act; and the person so doing if the gun chances to be loaded and is discharged, and injures another, is not excused from the consequences of this negligent act on account of the care which he took prior to its commission to determine whether the gun was loaded. I therefore charge you, gentlemen of the jury, that, under the undisputed evidence in this case, the act of the defendant in pointing the gun at the plaintiff, raising the hammer, and pulling the trigger, which caused the gun to be discharged and to injure the plaintiff, was a negligent act on the part of the defendant, and rendered him liable to the plaintiff in this action, and your verdict must be in his favor, unless you find that the plaintiff himself was guilty of contributory negligence. The plaintiff, in order to recover, must establish, by a preponderance of evidence, two facts: *First*, that the injury

was caused by the negligence of the defendant; *second*, that he himself was not guilty of contributory negligence. And the burden of proof is upon the plaintiff to establish both of these propositions. I have already instructed you that, as a matter of law, the plaintiff has established the first proposition,—that the defendant, in so pointing the gun and discharging it, was guilty of negligence."

The sections of the statute referred to by the court in its charge to the jury are 9110–9113, inclusive, of 2 How. Stat. The act was passed in 1869, and is entitled "An act to prevent the careless use of firearms." In *People* v. *Chappell*, 27 Mich. 486, this statute was under consideration, and it was held that a prosecution would not lie, and a conviction would not be sustained, under it, where the use of firearms was not careless, but was intentional or malicious. Mr. Justice CAMPBELL, in speaking of the act, said:

"The statute was designed to punish a class of acts done carelessly, but without any design of doing mischief, and the various sections must, under our Constitution, be construed so as to conform to the title. The absence of malice is as necessary an ingredient in the statutory definition as the use of firearms. And the offense is purely statutory."

Section 9113 provides:

"Any party maimed or wounded by the discharge of any firearm as aforesaid * * * may have an action on the case against the party offending, for damages, which shall be found by a jury," etc.

The general rule, and without reference to this statute, is that a very high degree of care is required from all persons using firearms in the immediate vicinity of others, no matter how lawful or even necessary such use may be. 7 Am. & Eng. Enc. Law, 523. This same principle is stated in 2 Shear. & R. Neg. (4th Ed.) § 686. In *Morgan* v. *Cox*, 22 Mo. 373 (66 Am. Dec. 623), it was held that, where injury to another is caused by an act that would have amounted to trespass *vi et armis* under the old system of actions, it is no defense that the act oc-

curred through inadvertence, or without the wrong-doer's intending it; it must appear that the injury done was inevitable, and utterly without fault on the part of the alleged wrong-doer. Defendant's counsel contended that if the jury found that the defendant had used the ordinary and usual means of unloading the gun, and satisfied himself by such means that the gun was unloaded, then he could not be charged with negligence. We think the court very properly refused that instruction. As was said in *Castle* v. *Duryee*, 2 Keyes, 173:

"It is not the law that if one, supposing a musket to be unloaded, or to be charged only with powder, snaps it at another, and he is wounded, he is irresponsible in a civil action; and it is of no consequence, so far as maintaining the action is concerned, that he acted upon the most plausible or the most reasonable grounds, and fully believed that the gun was not charged with anything which could injure another."

In *Judd* v. *Ballard*, 66 Vt. 668, it appeared that the plaintiff was injured by the discharge of a revolver in the hands of the defendant while the two were facing each other, lying in the bottom of an express wagon. The defendant had discharged one of the barrels for amusement, and was fixing the hammer, preparatory to returning the revolver to his pocket, when the discharge which injured the plaintiff occurred. It was said by the court that, "upon the facts presented, the defendant is clearly answerable for the damages." It was further said: "The shooting of the plaintiff was an accident, but in no sense an unavoidable accident. It would not have occurred but for the defendant's carelessness. The test of liability is not whether the injury was accidentally inflicted, but whether the defendant was free from blame,"—citing *Vincent* v. *Stinehour*, 7 Vt. 62 (29 Am. Dec. 145); *Morris* v. *Platt*, 32 Conn. 75; *Bullock* v. *Babcock*, 3 Wend. 391. It was further stated in that case:

"The injury was the direct result of a force put in

motion by the defendant.  The fact that the force was put in motion through negligence does not preclude the plaintiff from maintaining trespass.  Neither an intention to injure the plaintiff, nor an intention to do the act which caused the injury, is essential.  It is sufficient if the defendant does a positive act from which the plaintiff suffers an immediate injury,"—citing 1 Smith, Lead. Cas. 560; *Leame* v. *Bray*, 3 East, 593; *Welch* v. *Durand*, 36 Conn. 182 (4 Am. Rep. 55); *Claflin* v. *Wilcox*, 18 Vt. 605; *Howard* v. *Tyler*, 46 Vt. 683.

The court, continuing, further said:

"It was proper to direct a verdict.  There was no room for conflicting views as to the essential feature of the defendant's conduct.  The question was not whether it was proper to place the hammer between two cartridges, nor whether the defendant was handling the hammer in a proper manner.  However proper it may have been to place the hammer in that position, and whatever the care with which the defendant was moving the hammer, it was negligence to be adjusting it with the revolver so held that an accidental discharge would injure the plaintiff.  There was no evidence tending to show that the position of the revolver at the time of discharge was due to any controlling outside force, and no circumstances are shown from which the presence of such a force could be inferred.  Any danger that might arise from the jolting of the wagon the defendant was bound to consider.  The undisputed facts admit of no inference which could relieve the defendant from liability."

In *Tally* v. *Ayres*, 3 Sneed, 677, it was said:

"To constitute an available defense in such cases, it must appear that the injury was unavoidable, or the result of some superior agency, without the imputation of any degree of fault to the defendant.  The lawfulness of the act from which the injury resulted is no excuse for the negligence, unskillfulness, or reckless incaution of the party.  Every one in the exercise of a lawful right is bound to use such reasonable vigilance and precaution as that no injury may be done to others.  Nor is it material, in a civil action for the recovery of damages, whether the injury was willful or not."

See, also, *Reg.* ₪v. *Salmon*, 6 Q. B. Div. 79, 29 Moak, Eng. R. 503.

It is apparent from the defendant's own testimony that he was responsible for the cartridges having been left in the gun. He had been hunting that day, and had loaded it with cartridges. The fact that he believed that he had removed them all from the gun would not relieve him from responsibility in snapping it, when he knew it was pointed directly towards the plaintiff. Had he examined the gun, he would, of necessity, have seen the cartridge there, as it was shown that it would have been in plain view when placing the works back in the gun; also, that, when pulling the lever, the cartridge being raised into the barrel, had he then looked he could have seen the cartridge in the barrel. He testified that the gun was pointing at the plaintiff all the time he was fixing it, and that it was in the same direction when he snapped it off. The statute is aimed at just such cases as the present. It was also a plain violation of the statute to snap the gun while it pointed directly towards the plaintiff, and this violation of statutory duty is negligence *per se;* but, aside from this, we think that under the well-settled rules, and under the authorities above cited, the defendant was guilty of negligence, and was liable in a common-law action.

The only other contention in the case which we deem it necessary to discuss is the claim made by the defendant that the plaintiff was guilty of contributory negligence. That question, however, we think, was fully and fairly submitted to the jury. The court charged them upon that proposition as follows:

"The claim of the plaintiff is that, when he came into the hotel there that evening for the purpose of having a friendly visit with the defendant, he found him engaged in repairing the lock of his gun. He says he took a seat a short distance from him, but out of the range of the gun, as the defendant was then handling it; * * * that, after the defendant had repaired the lock and put it together again, that he took this gun up, after some remarks had been made in regard to snapping it or trying

it, and shifted its position so that it then was pointing towards him, and snapped the gun. His claim is that this changing of the gun as he took it up in order to cock it was done so soon that he had no opportunity to protest or get out of the way. If you find that this occurred as claimed by the plaintiff, then he was not guilty of contributory negligence. On the other hand, it is claimed by the defendant that, during all the time the plaintiff remained there, he was sitting either in actual range of this gun, or so near that a slight movement of it would have brought him in range. His claim is, too, that after the lock had been repaired, and while the defendant was operating the hammer to test the strength of the mainspring, that the plaintiff requested him to try or snap the lock while it was pointed (he made this request, rather, at a time when the gun was pointed) right towards the plaintiff in the case; that this request was made twice; that then the defendant did snap the gun; that it proved to be loaded; there was an explosion, and the bullet penetrated the thigh of the plaintiff. If you find that the defendant's version of this is true, I charge you that if you find that during the 20 minutes or so that the plaintiff sat by the defendant before the accident, and while the defendant was repairing the gun, the plaintiff sat in range of the gun, or so nearly within the range of it that a slight movement of it might bring him within range, and if, while sitting there, he knew the defendant was about to snap the gun to try the lock, and had time either to protest or get out of the way, and did neither, or if you find that the plaintiff invited the defendant to try it or snap it, meaning thereby to allow the hammer to strike so as to discharge the cartridge, if one happened to be in the gun, then the plaintiff was guilty of contributory negligence, and he is not entitled to recover. As I have said to you, the burden of proving that he was not guilty of contributory negligence is upon the plaintiff."

There is a claim made in the case that the court improperly allowed certain expert testimony to be given, bearing upon the question of defendant's negligence in handling the gun; but inasmuch as we hold the court was correct in charging the jury, as matter of law, that the

defendant was guilty of negligence, this question is of no importance, and will not be discussed.

The judgment must be affirmed.

The other Justices concurred.