## BILL EDWARDS v. LOUISE G. JOHNSON.

(Filed 20 January, 1967.)

**1. Trial § 21—**

On motion for involuntary nonsuit, the evidence must be taken most strongly against defendant.

**2. Assault and Battery § 8—**

While a person is entitled to defend his home against forcible entry by an intruder, he may not shoot even a trespasser until the trespasser attempts to force an entry in a manner sufficient to lead a reasonably prudent person to believe that the trespasser intends to commit a felony or to inflict some serious injury.

**3. Weapons and Firearms § 2;   Negligence § 4—**

A firearm is a dangerous instrumentality, and a person handling a firearm is required to exercise care commensurate with the dangerous character of the article.

**4. Same;   Negligence § 5—**

When a firearm is discharged and inflicts injury while in the possession and control of a person, there is a presumption that the firing is intentional or the result of carelessness or inadvertence on the part of such person, which presumption is sufficient to take the issue of negligence to the jury in the absence of evidence in explanation.

**5. Weapons and Firearms § 2—   Evidence held for jury upon issue of negligence in accidental discharge of gun, and not to show contributory negligence as a matter of law on part of victim.**

The evidence tended to show that plaintiff customarily visited the home of defendant and her husband at nighttime in the transaction of business and on such occasions went to the back door, that on the morning of the occasion in suit he had telephoned that he would stop by when he was in the vicinity, that on the occasion in suit he knew the husband was not home and that defendant was uneasy on such occasions, that he stopped by defendant's home at 9:30 at night and knocked on the back door, that defendant came to the door carrying a loaded and cocked shotgun with her right hand and arm, turned on the porch light, and as she was pushing back the curtain from the door, the barrel of the gun hit the door and the gun fired, injuring plaintiff seriously and permanently. The evidence further tended to show that on a previous occasion plaintiff had seen the gun on the kitchen table when he had knocked at the back door, that the gun belonged to defendant and that she knew how to load it and was accustomed to handling it. *Held:* The evidence is sufficient to be submitted to the jury on the issue of defendant's negligence and not to show contributory negligence as a matter of law on the part of plaintiff.

LAKE, J., dissenting.

PARKER, C.J., joining in the dissent in part.

BRANCH, J., joins in the dissent of PARKER, C.J.

APPEAL by plaintiff from *Hasty*, *S.J.*, July Civil Session of FOR-SYTH.

Plaintiff sues for personal injuries sustained on September 28, 1964, when defendant accidentally discharged a shotgun. Plaintiff's evidence tends to show:

Plaintiff, a loan officer for an industrial bank in Winston-Salem, moonlights as a general insurance salesman. Defendant, Mrs. Louise G. Johnson, lives with her husband and three small children about 6 miles from the center of Winston-Salem and about three-quarters of a mile inside the city limits. Since June 1962, plaintiff has handled the insurance business of defendant and her husband. All his transactions with them have been at their home, usually between 7:00 and 11:00 at night. Defendant had told him that it was not necessary to telephone before stopping by because they were usually up until 11:30 or 12:00 at night. In consequence, plaintiff did not do business with them on an appointment basis. On each occasion when he had visited the Johnson home, plaintiff had gone to the rear door.

On September 28, 1964, Mr. Johnson was in Florida on business, a fact which plaintiff knew. About 11:00 a.m. on that day, defendant called plaintiff with reference to some complications which had arisen in connection with the insurance and loan on the automobile she and her husband had purchased a few weeks earlier. Plaintiff told her he would stop by her home the next time he was in the neighborhood. As a result of that conversation in the morning, plaintiff went to the Johnson home that night about 9:30. He parked his car in the Y-shaped parking area to the left of the driveway about 20 feet from the kitchen window and proceeded to the rear entrance of the house, which was just in front of his automobile to the left. The only light he could see was one in the kitchen. He found the door to the screened back porch standing wide open. A light shone through the curtains over the door between the kitchen and the porch. Plaintiff knocked on the door, waited 20-30 seconds and knocked again before he heard footsteps coming to the door. Then there was a loud explosion and he felt pain. A discharge from a shotgun had fractured his right leg, damaged the nerves, and injured the soft tissues. Defendant cracked the door and screamed when she saw plaintiff. He told her that she had shot him and asked her to call an ambulance. At his request, she procured a cloth, which they applied as a tourniquet while waiting for the ambulance. Defendant remained in the hospital for a month. He was first in a cast, then in a brace for about a year, and it was not until May 1965 that he was able to return to work. He has a permanent, partial injury to his leg.

Plaintiff's version of defendant's explanation to him of the shooting was: "She told me that she knew nothing about them (firearms). . . . She told me that she heard a noise. When I knocked, she picked up the gun, loaded it, pulled the hammer back and went to the door. She said as she was reaching to turn on the light switch, the gun went off." Defendant told plaintiff that the accident was her fault.

On prior occasions, plaintiff had seen the gun, a single barrel 16 gauge shotgun, in Mrs. Johnson's possession. One night about three weeks earlier when he had stopped by between 9:45 and 10:00, defendant came to the back door, turned on the light, pulled back the curtain, and then opened the door for him. When he walked in, he saw the gun on the kitchen table. Defendant told him she kept the gun for her protection.

Defendant gave the following explanation to L. C. Masencup, the police officer who investigated the shooting immediately after it occurred:

> "[S]he (defendant) stated that she was getting ready for bed. . . . when she heard some dogs barking in the back yard and heard someone on her back porch or something on her back porch. She said she took her 16 gauge shotgun and loaded it and went to the back door and turned on the back porch light and saw a shadow on the back porch. She stated as she reached to push the curtains back from the back door — with the 16 gauge shotgun holding it in her hand and under her arm — and as she reached for the curtain, that the gun hit the door and went off. She said she was holding the gun in her right hand. She told and described to us how she had the gun in her arm — down at an angle. I don't recall her showing us whether she had her hand on the trigger. I asked if the gun was cocked at the time, and she said she could not remember — she didn't remember cocking the shotgun. . . . She had contacted him on this date requesting that she see him in regard to a loan and some insurance. . . . She was not expecting him this late at night. She said after she saw who it was, she said she didn't have any intention of shooting him. She stated at that time that there had been some prowlers in the neighborhood, and this was the reason she got the gun, and she looked nervous and upset. She said that she did not do it intentionally, and said she had known him for quite sometime."

Defendant also told the officer that the gun belonged to her and not to her husband. Masencup found a small amount of white paint on the end of the barrel where it apparently had hit the door.

Defendant's motion for judgment of nonsuit made at the conclusion of plaintiff's evidence was denied. Defendant, without offering any evidence, rested and renewed her motion. At the conclusion of all the evidence, the motion was allowed. From a judgment dismissing the action, plaintiff appeals.

*White, Crumpler, Powell and Pfefferkorn for plaintiff appellant.*
*Hudson, Ferrell, Petree, Stockton, Stockton & Robinson by R. M. Stockton, Jr. and J. Robert Elster for defendant appellee.*

SHARP, J.  Plaintiff alleges that the injuries for which he seeks compensation were caused by the negligent manner in which defendant handled a loaded shotgun. Defendant denies negligence and pleads contributory negligence.

In evaluating a motion for nonsuit, the evidence must be considered in the light most favorable to the plaintiff, who is entitled to every reasonable inference therefrom. "The rule is sometimes stated conversely, with perhaps more pointed significance. Upon demurrer, the evidence must be taken most strongly against the defendant." *Fox v. Army Store,* 215 N.C. 187, 190, 1 S.E. 2d 550, 551.

Plaintiff's evidence is sufficient to justify the jury in making these findings: Plaintiff handled all insurance matters for defendant and her husband, transacting business with them at night at their home. He always came to the back door, and defendant had told him it was not necessary to telephone before coming. On the morning of September 28, 1964, defendant had telephoned plaintiff about an insurance problem, and he had agreed to stop by when he was in the vicinity. As a result of her call, plaintiff went to defendant's home that night at 9:30 — as usual, without first telephoning. Plaintiff knew defendant's husband was away and that she was uneasy when she was alone in the house. When plaintiff knocked at the kitchen door, according to his custom, defendant came to the door carrying a loaded and cocked shotgun with her right hand and arm. She turned on the back porch light and, as she was pushing back the curtains from the door, the barrel of the gun hit the door and went off, injuring plaintiff seriously and permanently. Although she told plaintiff she knew nothing about firearms, defendant was not unfamiliar with the shotgun. It belonged to her individually. She knew how to load it; she had loaded it when she heard plaintiff's knock at the door. With the hammer down, the gun would not fire; it had to be cocked first. Defendant was accustomed to handling the gun. She had told plaintiff that she kept it for her protection. He had seen it in her possession on prior occasions. Three weeks earlier, he

had seen it on the kitchen table when he had knocked at the back door between 9:45 and 10:00 p.m. On that occasion, defendant had turned on the porch light, pulled back the curtain, and had then opened the door for him.

Upon this evidence, defendant contends that she is equally entitled to a judgment of nonsuit on the grounds (1) that the evidence fails to disclose any negligence on her part and (2) that it affirmatively discloses plaintiff's contributory negligence. Defendant argues in her brief that she, "as most women under similar circumstances would be, was frightened and uneasy when at home alone at night in a neighborhood troubled with prowlers"; that plaintiff knew she kept a shotgun for her protection and that her husband was away; and that plaintiff's conduct "in prowling around the back of the defendant's home in the middle of the night . . . and making noises at the kitchen door without any forewarning . . . constituted an emergency situation" which made defendant's response thereto foreseeable; reasonable, and prudent. She further asserts that "fundamental in our law is the sanctity of one's home and the right to protect it."

The right to defend one's home against forcible entry by an intruder is well settled in this State. A householder, however, may not intentionally shoot even a trespasser until he attempts to force an entry in a manner sufficient to lead a reasonably prudent person to believe that he intended to commit a felony or to inflict some serious personal injury upon the occupants of the house. *State v. Miller,* 267 N.C. 409, 148 S.E. 2d 279. In other words, one may not shoot first and investigate later. "There must be actual or apparent necessity to shoot; otherwise, shooting at a human being is unlawful." *State v. Phillips,* 262 N.C. 723, 726, 138 S.E. 2d 626, 628.

The evidence in this case does not invoke the right of a householder to defend his habitation for the reason that defendant did not intentionally shoot to repel an invasion of her home or an assault upon her person. She discharged the gun accidentally. Even if this had not been the case, however, she would not have been justified in shooting intentionally, for the person at the door had neither threatened nor attempted any violence. Until he had done so, she was not entitled to assume the worst — certainly not before she had inquired, "Who's there?" Under the circumstances disclosed here, this simple inquiry usually would have been the first act of the average woman of ordinary firmness. Had defendant merely inquired who was at the door before she cocked the gun (an operation performed by the thumb in one second), and before she had turned on the porch light and at-

tempted to pull back the curtain, this tragedy would have been averted.

In appraising both plaintiff's and defendant's actions, it must be remembered that this was not the first time plaintiff had come to defendant's back door at night, albeit her husband usually had been at home when he came. Plaintiff always did business with defendant and her husband in their home, usually at night and sometimes as late as 11:00. Furthermore, plaintiff always came to the back door — presumably because of the design of the driveway and parking area. On previous occasions, defendant had told him that it was not necessary to telephone before coming. In addition, she had called plaintiff that very day about an insurance matter, and he had told her that he would come by the first time he was in the vicinity. When the knock came that night at 9:30, she might reasonably have anticipated that it was plaintiff. It might also have been a neighbor, a visiting relative or friend, the paper boy collecting, or a distressed motorist seeking a telephone. It might have been any one of a number of persons on a lawful mission. The unknown person outside could, of course, have been a marauder, but until he had made some threat or attempt at a forcible entry, she was not justified in convicting him, nor was she relieved of her duty to exercise the utmost care to prevent the unintentional discharge of the gun.

It is settled law with us that the highest degree of care is exacted of those handling firearms. "The utmost caution must be used in their care and custody, to the end that harm may not come to others from coming in contact with them. The degree of care must be commensurate with the dangerous character of the article." *Brittingham v. Stadiem,* 151 N.C. 299, 302, 66 S.E. 128, 130. See *Belk v. Boyce,* 263 N.C. 24, 138 S.E. 2d 789. "The same degree of care is, no doubt, expressed by saying that the care which persons using firearms are bound to take in order to avoid injury to others is a care proportionate to the probability of injuries to others. . . ." 56 Am. Jur., Weapons and Firearms § 23 (1947). One who handles a loaded gun is charged with the knowledge that it is a dangerous instrumentality which, if accidentally discharged, might cause injury to others. *Naegele v. Dollen,* 158 Neb. 373, 63 N.W. 2d 165, 42 A.L.R. 2d 1099. If one is injured from the discharge of firearms negligently used or handled by another, the person causing the injury is civilly liable even though the discharge was not intended. *Skinner v. Ochiltree,* 148 Fla. 705, 5 So. 2d 605, 140 A.L.R. 410.

> "Any loaded firearm . . . is a highly dangerous instrumentality and, since its possession or use is attended by extraordinary danger, any person having it in his possession or using

EDWARDS *v.* JOHNSON.

it is bound to exercise extraordinary care. A person handling or carrying a loaded firearm in the immediate vicinity of others is liable for its discharge, even though the discharge is accidental and unintentional, provided it is not unavoidable." *Kuhns v. Brugger*, 390 Pa. 331, 338, 135 A. 2d 395, 400, 68 A.L.R. 2d 761, 769.

As the Illinois court pointed out in *Atchison v. Dullam*, 16 Ill. App. 42, 46 (1884), "Firearms are not usually discharged without the intervention of some human agency. A presumption, therefore . . . is raised that when such weapons are discharged while in the possession and control of another, the firing is caused either by design, carelessness, or inadvertence upon his part." The opinion in *Atchison* quotes from *Tally v. Ayres*, 35 Tenn. 677, a case in which plaintiff's horse was killed when a gun discharged as defendant placed it upon his shoulder:

> "[T]he very fact that the gun *'went off'*, under the circumstances detailed in the proof, implies, of necessity, some inadvertent act, or want of proper caution on the part of the defendant. The *lock* must either have been defective, or some agency must have been exerted, unintentionally and perhaps unconsciously, by the defendant, otherwise the discharge of the gun could not have happened." *Id.* at 681.

Certainly, we cannot say, as a matter of law, that an ordinary knock at the door at 9:30 p.m., without more, is calculated to create in a woman, situated as defendant, such a reasonable apprehension of serious and immediate danger that she might be expected to forget all the safety rules for handling a loaded gun, and that she may not, therefore, be held responsible if she permits the gun to discharge as she peers through the curtains to ascertain the identity of her caller. On the contrary, in the absence of any evidence of a mechanical defect in the gun, we think the fact that it did discharge under these circumstances is sufficient evidence to take the case to the jury on the issue of defendant's negligence. She had the sole control and custody of the weapon; no other person was present; no superior agency or outside force intervened. There is no suggestion in the pleadings or evidence that the gun was defective in any way. See *Crump v. Browning*, 110 A. 2d 695 (D. C. Munic. Ct. App.), 46 A.L.R. 2d 1212; Annot. *Res Ipsa Loquitur*-Firearms, 46 A.L.R. 2d 1216; 94 C.J.S., Weapons § 29(d) (1956); 56 Am. Jur., Weapons and Firearms § 22 (Cum. Supp. 1966); 3 Strong, N. C. Index, Negligence § 5 (1960). For the reasons implicit in the preceding dis-

EDWARDS *v.* JOHNSON.

cussion, it likewise cannot be said that plaintiff's evidence discloses his contributory negligence as a matter of law.

The nonsuit was improvidently granted, and the judgment dismissing the action is

Reversed.

LAKE, J., dissenting: The defendant offered no evidence. There is no significant conflict in the testimony of the plaintiff and the investigating officer as to how the shooting occurred. The motion for judgment of nonsuit must be determined upon the facts related by them and inferences, favorable to the plaintiff, which may reasonably be drawn therefrom. The questions to be resolved are: (1) Are these facts and inferences sufficient to support a finding that the defendant was negligent in her handling of the shotgun? (2) If so, do these facts and inferences lead necessarily to the conclusion that the plaintiff was negligent in going to the defendant's home as he did, in view of the hour and the circumstances known to him, and was this conduct on his part one of the proximate causes of the injury? In my opinion the first question should be answered "No," and the second should be answered "Yes." Either answer requires the affirmance of the judgment of nonsuit since the basis of liability for injury resulting from the accidental discharge of a firearm is negligence and the injured party cannot recover where his own negligence contributed to his injury. *Belk v. Boyce,* 263 N.C. 24, 138 S.E. 2d 789; *Rudd v. Byrnes,* 156 Cal. 636, 105 P. 957; *Bahel v. Manning,* 112 Mich. 24, 70 N.W. 327; *McLaughlin v. Marlett* (Mo. App.), 228 S.W. 873, affirmed 296 Mo. 656, 246 S.W. 548; *Webster v. Seavey,* 83 N.H. 60, 138 Atl. 541, 53 A.L.R. 1202; *Magar v. Hammond,* 171 N.Y. 377, 64 N.E. 150; 56 Am. Jur., Weapons and Firearms, § 31.

These facts are undisputed: The plaintiff went to the defendant's back door at or after 9:30 p.m. The house was dark except for a light in the kitchen. The defendant was at home alone except for her three little children, the eldest being six years of age. Her husband was out of the city, as the plaintiff knew. The defendant was preparing to retire for the night. She had not been informed that the plaintiff was coming to her house that evening. When he came he did not identify himself but merely went upon the darkened back porch and knocked at the kitchen door. The city police had received numerous calls about prowlers in this neighborhood prior to this occasion. The defendant knew that there had been prowlers in the neighborhood. Hearing the knock, the defendant loaded her shotgun, cocked it, went to the back door, turned on the back porch

light, observed a shadow through or upon the curtain over the glass portion of the door, reached with her left hand to pull aside the curtain to see who was on the porch and accidentally struck the end of the barrel of the gun against the door. Thereupon the gun discharged.

The plaintiff testified:

> "I did not know that Mrs. Johnson was *frightened* when she was there when her husband was away. I did not know that she was *terrified* when she was there by herself. I had seen her before with a shotgun in the house, and she told me she kept that for protecting herself. That was before this accident which happened on September 28, 1964. I actually saw the gun. * * * I knew that Mrs. Johnson was *uneasy* when she was alone in the house when her husband was away." (Emphasis added.)

To say that he did not know she was "frightened" but did know she was "uneasy" when her husband was away is a mere play upon words. He testified that he knew she had been sufficiently "uneasy" under the same circumstances only three weeks before, and at the same hour of the evening, to have her shotgun lying on the table of the very room, on the door of which he knocked, and that her purpose in having the gun there three weeks earlier was for her "protection."

Upon the question of the sufficiency of this evidence to support a finding that the defendant was negligent, I divide the inquiry into two parts:

> (1) When a woman, living in an area recently disturbed by prowlers, is alone in her home save for three tiny children, her husband being out of the city, is preparing to retire for the night, her home being darkened except for a single light in the kitchen, and hears an unidentified person come upon her darkened back porch and knock at the door, is she negligent in carrying with her to the door a loaded and cocked gun?
>
> (2) Assuming it is not negligence to carry the loaded and cocked gun to the door, may negligence be inferred from the fact that, as she reached with one hand for the door curtain, the barrel of the gun, held in the other hand, accidentally struck the door and the gun was thereby discharged?

The majority opinion does not make clear in which of these respects the majority finds the defendant to have been negligent, but it would appear to be the majority view that it was negligence for

her to carry a cocked gun to the door. If the defendant was negligent in either respect, such negligence would, of course, support the majority's conclusion upon the issue of negligence.

The right of a householder to keep in his or her home a firearm, loaded and ready for instant use in the protection of the householder and other members of the family against the danger of assault by an intruder is established. Constitution of the United States, Amendment II; Constitution of North Carolina, Article I, Section 24. As the Pennsylvania Court said in *Kuhns v. Brugger,* 390 Pa. 331, 135 A. 2d 395, "No one can question the right or the prudence of (the homeowner) being armed against possible midnight prowlers and intruders." As this Court said in *State v. Spruill,* 225 N.C. 356, 34 S.E. 2d 142, "The right of a person to defend his home from attack is a substantive right."

It has been repeatedly held by this Court that one in his own home and under reasonable apprehension of an attack, likely to result in death or great bodily harm to himself or a member of his family, may shoot to prevent such invasion of his home, the reasonableness of such apprehension being judged by the circumstances as they appear to the defendant. *State v. Francis,* 252 N.C. 57, 112 S.E. 2d 756; *State v. Sally,* 233 N.C. 225, 63 S.E. 2d 151; *State v. Baker,* 222 N.C. 428, 23 S.E. 2d 340. Thus, if the defendant had intentionally fired her gun and wounded the plaintiff, she would not be liable in damages if she believed and had reasonable grounds for the belief that he was a prowler seeking to invade her home in order to do violence to herself or to her little children asleep in their cribs. In such case, it would be immaterial that, in fact, as here, the person so shot had no improper motive in coming to the house. *State v. Francis, supra; Patterson v. Kuntz,* La. App., 28 So. 2d 278.

As Chief Justice Pearson said in *State v. Floyd,* 51 N.C. 392, "One cannot be expected to encounter a lion as he would a lamb." In the nighttime, the tread and tap of a "lamb" at an unlighted back door may easily be mistaken for those of a "lion," especially by a woman alone save for three infants, and "uneasy."

It is a matter of common knowledge that there has been, and continues to be, an alarming increase in serious crimes throughout our country. In the October, 1966, issue of "Trial Judges' Journal," John Edgar Hoover, Director of the Federal Bureau of Investigation, said:

> "Last year, an estimated 2,780,000 serious crimes — murders, forcible rapes, aggravated assaults, robberies, burglaries, automobile thefts and larcenies involving $50.00 or more — were

committed in the United States. This is the highest total in the history of recorded crime statistics. It reflects a six per cent rise over the number of serious offenses reported in 1964, and an alarming 46 per cent increase over 1960."

It is also a matter of common knowledge that the lone woman in her home at night is an inviting target for vicious criminals, stimulated by judicial assurance that the police and the prosecuting attorney must work under handicaps which, until recently, neither they nor anyone else suspected were imposed by the Constitution of the United States. These well known facts must be taken into account in judging the reasonableness of precautions taken by a woman, summoned in the nighttime to her back door by the knock of an unexpected visitor who does not announce his identity. Under these circumstances, I cannot consider it negligence for such a woman to carry a loaded gun with her as she goes to determine whether the visitor is a "lamb" or a "lion." Nor is it negligence for her to have the gun ready for instant use. It is not unreasonable for her to apprehend that the charge of the "lion" may be sudden and ferocious.

That which may be unreasonable apprehension in a man, alone in his residence at night, is not necessarily so in the case of a woman similarly situated. In *State v. Miller*, 221 N.C. 356, 20 S.E. 2d 274, this Court recognized that the age and physical weakness of the defendant are matters to be considered in determining the reasonableness of his preparation for defense against an apprehended assault. The sex of the defendant is also material upon this question.

We come then to the question of whether the defendant, upon arrival at the door, failed to use due care to prevent the unintended discharge of the gun.

Care which is "due care" in the handling of a club, or even of a boy's air rifle, is not "due care" in handling a shotgun. A loaded and cocked shotgun is such an extremely dangerous instrumentality, when carried in the vicinity of another person, that the possessor must use a high degree of care to prevent an unintentional firing of it. *Jensen v. Minard*, 44 Cal. 2d 325, 282 P. 2d 7; *Rudd v. Byrnes, supra; Crump v. Browning* (Mun. Ct. App. D. C.), 110 A. 2d 695, 46 A.L.R. 2d 1212; *Skinner v. Ochiltree*, 148 Fla. 705, 5 So. 2d 605, 140 A.L.R. 410; *Bahel v. Manning, supra; Naegle v. Dollen*, 158 Neb. 373, 63 N.W. 2d 165, 42 A.L.R. 2d 1099; *Kuhns v. Brugger, supra;* 56 Am. Jur., Weapons and Firearms, § 23. In *Brittingham v. Stadiem*, 151 N.C. 299, 66 S.E. 128, this Court said:

"In *Mattson v. R. R.*, 95 Minn. 477; 70 L.R.A. 503, it is held: 'The degree of care required of persons having the pos-

session and control of dangerous explosive, such as firearms or dynamite, is of the highest. The utmost caution must be used in their care and custody, to the end that harm may not come to others from coming in contact with them. The degree of care must be commensurate with the dangerous character of the article.' The same doctrine is held by this Court."

This rule was also approved in *Luttrell v. Mineral Co.*, 220 N.C. 782, 18 S.E. 2d 412, and in *Belk v. Boyce, supra*, Moore, J., speaking for the Court, said:

"Persons having possession and control over dangerous instrumentalities are under duty to use a high degree of care commensurate with the dangerous character of the article to prevent injury to others. This rule applies to firearms."

It must, nevertheless, be borne in mind that the basis of liability for injury caused by the unintentional discharge of a firearm is negligence; that is, the failure to act as a reasonable person would act under the same circumstances. The possessor of a gun is not an insurer against injury due to its accidental discharge. *Kuhns v. Brugger, supra*. The danger inherent in the loaded, cocked gun is one of the circumstances, but only one. The time, place and imminence or absence of danger to the bearer of the gun are other circumstances to be considered in determining whether due care — i. e., the highest practicable care — has been used in the handling of this dangerous implement. The circumstances surrounding this "uneasy" defendant, as she turned on the porch light and reached for the door curtain with an unknown person outside the door, are not the same circumstances as those surrounding a man who picks up an automatic pistol in the home of his host to gratify his curiosity as to its mechanical condition *(Crump v. Browning, supra)*, or one who undertakes to drive an unruly cow by striking her with the barrel of a cocked shotgun *(Morgan v. Cox,* 22 Mo. 373), or who experiments with the cocking and snapping of a gun in a store *(Brittingham v. Stadiem, supra; Naegle v. Dollen, supra)*, or who hands a cocked gun over a gate to a hunting companion *(Gibson v. Payne,* 79 Or. 101, 154 P. 422), or who, while sitting in his living room entertaining a guest, undertakes to make an adjustment in the firing mechanism of his gun and then, while it is pointed at the guest, cocks it *(Bahel v. Manning, supra)*, or who fires a rifle at a sparrow when children have just walked past the sparrow's perch *(Jensen v. Minard, supra)*, or who, with his gun pointed at his hunting companion, undertakes to uncock it knowing that the hammer is defective *(Annear v. Swartz,* 46 Okla. 98, 148 P. 706).

It is well settled that one confronted with an emergency, which gives rise to a reasonable apprehension of danger of serious and immediate injury, is not held to the standard of care required of one acting in an atmosphere of calm detachment. Strong, N. C. Index, Negligence, § 3, and cases there cited. Fright, which is both genuine and reasonable, is a circumstance to be considered in determining whether the bearer of a gun handled it with a degree of care commensurate with the nature of the instrumentality. The sex, age and physical strength of the defendant have a direct relationship to the reasonableness of her anxiety and to her inability to handle expertly her gun in one hand and the door curtain in the other. See *State v. Miller, supra.* Under such circumstances, she is not shown to have been negligent by proof that, as she reached for the curtain, the end of her gun barrel struck against the door and the jar caused the gun to fire.

There is much authority to the effect that, in the absence of an explanation of how the gun was fired, proof that the plaintiff was injured by the firing of a gun in the hands of the defendant who knew, or had reason to know, that someone was nearby and in the direction toward which the gun was pointed, is sufficient evidence of negligence to carry this issue to the jury. In *Crump v. Browning, supra,* the Municipal Court of Appeals of the District of Columbia said:

> "Nothing is better settled than the general principle that when the cause of an injury is (1) known, (2) in the defendant's control, and (3) unlikely to do harm unless the person in control is negligent, the defendant's negligence may be inferred without additional evidence. [Citations omitted.] It would be hard to imagine a situation more uniquely in the realm of *res ipsa loquitur* than this one. A man holds an automatic pistol in his hands, the pistol is discharged and wounds a friend. To say that *res ipsa* does not apply is to cast on the person shot the anomalous, if not impossible, burden of explaining how it happened."

As was said in *Atchison v. Dullam,* 16 Ill. App. 42:

> "Firearms are not usually discharged without the intervention of some human agent. A presumption, therefore, * * * is raised, that when such weapons are discharged while in the possession and control of another, the firing is caused either by design, carelessness or inadvertence upon his part."

In the excellent annotation in 46 A.L.R. 2d 1216, entitled *"Res Ipsa Loquitur* — Firearms," it is said:

"The conclusion drawn from the cases as to what constitutes the rule of *res ipsa loquitur* is that proof that the thing that caused the injury to the plaintiff was under the control and management of defendant, and that the occurrence was such as in the ordinary course of things would not happen if those who had its control and management used proper care, affords sufficient evidence, or, as sometimes stated by the courts, reasonable evidence, *in the absence of explanation by defendant,* that the injury arose or was caused by defendant's want of care. Thus, the occurrence of an injury under the circumstances as set forth permits an inference, or, in the terminology of some courts, raises a presumption, that defendant is guilty of negligence. * * * The doctrine of *res ipsa loquitur* has been held or recognized as applicable in cases of injuries inflicted by the accidental discharge of firearms where it is shown that defendant had the sole or exclusive control and management of the firearm at the time it was so discharged." (Emphasis added.)

However, the doctrine of *res ipsa loquitur* does not apply where the evidence shows how the occurrence in question came about. In Stansbury, North Carolina Evidence, § 227, it is said:

"The mere fact of injury, standing alone, will not 'speak for itself.' If the *thing that caused the injury* is not known, or if the known facts are such that conflicting inferences can be drawn from them with equal ease and the whole matter rests in conjecture and surmise, a finding of negligence cannot be supported. So too, if all the facts are known or conceded, a finding of negligence *vel non* must rest on those facts, and there is either no occasion or no room for *res ipsa loquitur.*"

The fact of injury by gunshot does not require the defendant to offer evidence to explain the shooting where, as here, the plaintiff, himself, does so. There is in this case no dispute as to what happened. The picture is clearly drawn by the plaintiff's own evidence and is not sufficient to support an inference that, upon arriving at the door, the defendant handled her gun in any manner not reasonable for a woman in her situation.

The evidence is, therefore, not sufficient to show negligence by the defendant in the unfortunate shooting of the plaintiff. But if it were sufficient to carry the plaintiff over that hurdle, he should, in my opinion, be held to have fallen on the barrier of contributory negligence.

The plaintiff's own evidence shows: He knew the defendant kept a shotgun handy when her husband was not at home, that on this

occasion her husband was out of the city, that the defendant had no knowledge of his intent to come to her house that evening, that upon his arrival the entire house was dark except for a single light in the kitchen, and that it was after the usual hours for visiting. Under those circumstances, he went to the back door of the house and knocked, without any effort to identify himself to the defendant before or as he heard her approaching the door. Even if it could be assumed from his telephone conversation with the defendant several hours before, as the majority opinion seems to do, that the plaintiff reasonably thought the defendant was expecting him to call at some time during that evening, it was not reasonable for him to suppose that she would know that this particular person at her back door was the plaintiff rather than a prowler. He had given the defendant no reason whatever to expect him at that particular time. It is my view that any reasonable man coming to the house, knowing the defendant's husband was out of the city and also knowing that under exactly the same circumstances, only three weeks earlier, the defendant had had a shotgun lying on the kitchen table for her protection, would have identified himself to the defendant by calling out as he approached the door, or by telephoning in advance of his visit. A normal interest in self preservation would seem to so dictate even if consideration for the lady's peace of mind did not.

In *Webster v. Seavey, supra,* the New Hampshire Court held that one, who goes upon a deer hunt without wearing a red cap or coat, may be found guilty of contributory negligence when shot by a companion who mistakes him for a deer. In *Rudd v. Byrnes, supra,* the California Court held that a deer hunter, leaving his assigned station and walking through the brush toward the station of his hunting companion, who mistook him for a deer and shot him, may be found guilty of contributory negligence.

In *McLaughlin v. Marlatt, supra,* the Missouri Court of Appeals had before it the case of a plaintiff shot when, for a prank, he crawled toward the defendant through tall grass in such a way that the defendant, seeing the grass moving, thought it was a fox and shot into the area of movement. The Court said:

> "He was in his sixteenth year, and if he did hide in the grass and produce the impression that a fox was there, ought he, as a boy of that age, in the exercise of ordinary care, to have apprehended that danger was likely to flow from such conduct? If he knowingly created, in the minds of the persons he was approaching, a reasonable belief that a fox was hiding in the grass, should he, in the exercise of reasonable care, have apprehended that it was likely to result in his being subjected to the treat-

ment a fox or a wild animal usually receives? \* \* \* For aught he knew, the boys might have a firearm along. It would not be wholly unreasonable for them to have one."

If a hunter is contributorily negligent in making noises like a deer as he approaches a stand of another hunter, and a farm boy is contributorily negligent when he moves through a meadow like a fox, surely it is contributory negligence for a man to make the approach of a prowler to the back door of the home of a lady whose husband he knows to be out of the city, and whom he knows to be so "uneasy" under those circumstances that she keeps a shotgun lying on the kitchen table.

While in the above cited cases the question of contributory negligence was held to be for the jury, in the present case the plaintiff's own evidence leads irresistibly to that conclusion.

The defendant's statement that the shooting was her fault was the mere conclusion of one not aware of the principles on which legal liability rests and moved by sorrow for the plaintiff's injury. It is not ground for denial of the motion for nonsuit. *Jones v. Hodge*, 250 N.C. 227, 108 S.E. 2d 436.

PARKER, C.J. I join in the excellent and scholarly dissenting opinion written by Justice Lake to this effect, that considering the plaintiff's evidence in the light most favorable to him and giving him the benefit of every legitimate inference to be drawn therefrom, there is not a scintilla of evidence tending to show that the defendant was guilty of actionable negligence. Being firmly convinced of this, I see no reason for a discussion of whether or not plaintiff is guilty of legal contributory negligence such as to bar his cause of action, and I think it is supererogatory to discuss the question of legal contributory negligence on the part of plaintiff.

I am authorized to state that JUSTICE BRANCH joins in this opinion.