FOWLER v. MONTELEONE. *
No. 14834.

Court of Appeal of Louisiana. Orleans.
March 12, 1934.

McCaleb & McCaleb, of New Orleans, for appellant.

Leander H. Perez and Prowell, McBride & Ray, all of New Orleans, for appellee.

HIGGINS, Judge.

Plaintiff, a member of a deer-hunting party, sued the defendant, another member thereof, to recover damages for personal injuries alleged to have resulted from the defendant negligently shooting him and also for medical expenses incurred.

Defendant admits that he shot the plaintiff, but denies that he was in any way at fault, and specially pleaded contributory negligence on the ground that the plaintiff had left his stand before the hunt was ended and placed himself in the underbrush in such a position as to give the apearance of being a deer.

There was judgment in favor of the plaintiff for the sum of $10,000, and the defendant has appealed.

On December 11, 1930, plaintiff and defendant, together with several friends, went to La Place, La., for the purpose of hunting deer. The party barricaded a rectangular wooded swamp section, which was bounded on one side by the Hammond highway, on the opposite side by the tracks of the Illinois Central Railroad Company, and on the remaining sides by the Peavine road and the Frenier Beach road. The dimensions of the rectangle were about one mile by three-quarters of a mile.

The party formed a barricade on the Peavine road; Vic Mailhes, Jr., being stationed near the intersection of that road with the Hammond highway. Next to him, in order, were the plaintiff, the defendant, Mr. Toups, Mr. Geisler, Mr. Marquette, and the last stand was taken by Mr. Vic Mailhes, Sr., where the Peavine road met the railroad tracks. The stands occupied by the parties were about 500 feet apart. The "piquets," those who follow the hunting dogs, and the dogs, were to chase the deer from the direction of the Frenier Beach road through this barricade. The party had hunted unsuccessfully in the morning and then resumed the hunt about 2 o'clock in the afternoon.

The rules governing the hunt were that a man should not leave his post for any appreciable distance, except the two end men, who might leave in order to assist in keeping the dogs within the bounds of the hunting area. The correct signal for the ending of the hunt was to be given by the captain, Vic Mailhes, Sr., and consisted of three blasts of a horn and three shots fired in succession and at about equal intervals. The hunt might also be ended by the captain going to each stand and bringing the members with him to one place. About 5 o'clock p. m. Vic Mailhes, Sr., left his stand, walked along the right of way of the Illinois Central Railroad Company, and then on the Frenier Beach road, where he picked up one of the party, Paul Georges, who was stationed there, and they drove back in an automobile to the point where the Hammond highway, which is paved, intersects the Peavine road, a straight dirt road partly covered by short grass. Mr. Mailhes, Sr., had instructed Georges to prepare to give the horn signal while he made ready to fire the shots as a signal that the hunt was over. Vic Mailhes, Jr., had walked in their direction and reached the point where they were standing at that time. Georges blew the horn several times, and it appears that plaintiff, believing that the hunt was ended, "broke" his gun, removed the shells, laid the gun on the road, and walked over into the swamp in the barricaded area for the purpose of gathering some mushrooms which he had seen while at his post. The defendant also heard the horn, but did not believe the hunt was over, and, having left his stand for some distance, his attention was attracted by the noise that plaintiff was making in picking the mushrooms. Dusk was approaching, the atmosphere was misty, and a large briar patch was between plaintiff and defendant, all of which prevented defendant

from seeing clearly. Plaintiff was dressed in a regular khaki hunting outfit (similar to the color of a deer), with red rubber hip boots, and was in a stooping position, with a part of a white handkerchief protruding from his rear pocket, when he was shot in the left buttock and thigh by the defendant with buckshot, all nine shots taking effect. Defendant describes the shooting as follows:

"I heard a rustling in underbrush, I figure about 30 minutes or so, approximately, before I fired the shot. So I waited until I could hear it really distinctly—I thought it was a rat or something. So I waited for 15 minutes approximately, and I still could hear it in the brush—it was about on a forty-five degree angle. So I waited a while longer, maybe five or ten minutes, and the noise was still in there, and I moved off about 20 or 25 feet, off my stand. There was a big briar patch there about a hundred or two hundred feet long. I thought I would move over about 20 or 25 feet to try to get a good view of it, and as I did, I stooped and looked into the briars, and I could not see anything, and I stooped again, and I taken a shot the fourth time. I seen something brown crawling with something white either crawling or walking, so I shot, thinking it was a deer."

He further testified, on cross-examination:

"Q. Is it your custom to shoot at an object before you know what it is? A. Yes, sir, when you see something like that.

"Q. In hunting, do you shoot at an object that you see in the brush, without making sure of what it is? A. I have shot at objects in the woods, in the swamp, and the briars and killed deer already.

"Q. And you could not tell what they were before you shot? A. No.

"Q. And that is the way you hunt? A. Yes that is the way.

"Q. Is that your custom? A. Well I have done it."

The evidence is conflicting as to whether or not the hunt had been called off and whether or not the plaintiff had wandered in close proximity to defendant's stand at the time he was shot, but, assuming that the hunt was still in progress and that the plaintiff wandered from his stand into the barricaded area, within firing range of the defendant, a view most favorable to him, let us consider whether or not he was guilty of primary negligence in shooting his companion under the erroneous belief that he was a deer.

We have not been referred to any Louisiana case in point. Plaintiff brings his suit under article 2315, Rev. Civ. Code, which reads in part as follows:

"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it."

Thompson, in his work on Negligence, in paragraph 780, states the rule with reference to the handling of lethal weapons as follows: "Persons having control and possession of fire-arms must exercise the utmost caution that harm may not come to others from such weapon. The degree of care is commensurate with the dangerous character of the weapons. The care is such as ordinarily cautious and prudent persons would exercise under similar circumstances."

In Cooley on Torts (3d Ed.) 1231, we find the following: "When one makes use of loaded weapons, he is responsible only as he might be for any negligent handling of dangerous machinery, that is to say, for a care proportioned to the danger of injury from it. A high degree of care is necessary in the use or manipulation of loaded weapons in the presence or vicinity of other persons and where injury results from a failure to exercise such care the defendant is liable."

In 53 A. L. R. p. 1205, of annotation to Webster v. Seavey, where 20 R. C. L. §§ 47 and 48, pp. 51 and 52, are cited, it is stated: "While no absolute standard of duty in dealing with such agencies can be prescribed, it is safe to say, in general terms, that every reasonable precaution suggested by experience and the known dangers of the subject are to be taken. The test of liability is the power of a prudent person to foresee injury; and this question, of course, depends on the particular circumstances of the case, including the nature of the instrumentality, the time, the place, and the status of the person injured." See, also, Sherman & Redfern on Negligence, vol. 3, par. 686; American & English Encyclopedia of Law (2d Ed.) vol. 12, p. 518.

In the case of Gibson v. Payne, 79 Or. 101, 154 P. 422, Ann. Cas. 1918C, 383, the charge of the judge of the lower court to the jury to the effect that the weapon, a shotgun, was dangerous to life and limb, and the defendant was presumed to know it, and that the care and precaution on his part in order to avoid injury must be commensurate to the danger involved, was held to be correct. See, also, Weaver v. Ward, Hob. 134; Brittingham v. Stadiem, 151 N. C. 299, 66 S. E. 128; Tally v. Ayres, 3 Sneed (Tenn.) 677; Morgan v. Cox, 22 Mo. 373, 66 Am. Dec. 623; Wright v. Clark, 50 Vt. 130, 28 Am. Rep. 496; Knott v. Wag-

ner, 16 Lea (Tenn.) 481, 1 S. W. 155; Atchison v. Dullam, 16 Ill. App. 42.

In the case of Webster v. Seavey, 83 N. H. 60, 138 A. 541, 542, 53 A. L. R. 1202, the defendant shot the plaintiff, mistaking him for a deer. The court held the following to be a correct charge for the jury: "A hunter, though he may not reasonably anticipate finding human being in woods, is required to use reasonable care to identify object seen before firing at it in order to ascertain that object is deer and not man."

In Koontz v. Whitney, 109 W. Va. 114, 153 S. E. 797, the plaintiff had climbed into some bushes in order to pick wild grapes, and was shot by the defendant, who thought he was firing at a squirrel rustling in the bushes. The court said: "Reasonable care and negligence are relative terms, and the degree of care required of a sportsman using a firearm must be commensurate with the dangers to be avoided."

In the cases to which we have referred, the gun was accidentally discharged, or the hunter shot some member of the public, but we shall now consider two cases in which a huntsman fired upon another under the erroneous belief that he was a deer. In the case of Harper v. Holcomb, 146 Wis. 183, 130 N. W. 1128, 1129, the court stated the facts to be as follows:

"Plaintiff served defendant on hunting expeditions (as a guide) before the one in question. Both were well acquainted with the dangers of their occupation. Plaintiff wore grey trousers,—quite the color of a deer,—a red sweater and cap, so as to render his person distinguishable to one observing him traveling through the brush from that of a deer. The two started from their camp about 9 o'clock in the morning accompanied by defendant's son. Plaintiff was furnished with a bell and whistle with which to signal defendant. At the best for the latter, plaintiff was to go out on the drive and when he started to come in fire a shot, or if he got on a trail of a deer two shots, and, in any event, ring his bell and use the whistle right along. Plaintiff testified that he was only to signal with his bell and whistle when he was on a deer trail,—driving one as he thought. When the party arrived near a swamp they separated, defendant and his son going to a location on a hill side, rising from the edge of the swamp, while plaintiff struck off through the swamp to make the drive. Defendant and his son posted themselves as directed some 300 feet apart. There was an old logging road through the swamp so located that a person traveling thereon would pass near where defendant was posted. Between the latter's location and the road there was brush, so, in looking from such location toward the road, the line of sight was through the obstructions. Soon after they reached the location, but before the time expected, plaintiff approached, traveling on the logging road. He had not given any signal of any kind. Looking toward the road, defendant suddenly observed, through the brush, an object which he thought might be a deer. He immediately drew a line on it with his gun preparatory to shooting. He hesitated an instant, uncertain whether the object was a deer or a human being or some other animated object. It remained stationary for an instant then started forward, quickly. Plaintiff could see only what to him appeared to be the fore part of a deer from the shoulders down. Without waiting to get a further view he pulled his gun, striking the object which proved to be plaintiff. The shot took effect in about the middle of the left thigh, fracturing the bone seriously. Plaintiff was about 300 feet from defendant, when shot.

"According to defendant's evidence and the state of the case at the best for him, plaintiff, contrary to the agreement as to signals, approached where he was shot, not only without giving signals, but some time before he could have arrived had he taken the course suggested when the two parted,—one to take his place on the side of the hill, and the other to make the drive."

The jury found as follows:

"Defendant did not exercise ordinary care and caution to distinguish what was the object shot at. Such failure was the proximate cause of plaintiff's injury."

The court said:

"* * * He said substantially as indicated. I just saw a flash and turned around and dropped my gun—that is pointed his gun at the object causing the flash in readiness to shoot. I hesitated. I was not, you might say, real sure whether the object was a man or a deer. The object was stationary for an instant. Then it kind of jumped. It looked to me like a deer. I could see from its shoulder down. It was in the direction Harper was to come from. It looked like the fore part of a deer and I fired. We consider that, as a matter of law, a confession of culpable carelessness. One would, naturally, think that a reasonably careful man, circumstanced as appellant was, would reserve his fire till he could observe the trunk of the object attracting his attention, and probably the head, —not to take the chance of what appeared

to be the shoulders and fore legs of a deer, being in fact the lower part of the person or a human being. * * *

"To hold appellant guilty of, merely, a want of ordinary care, is putting the matter quite mildly. * * * If the court upon the trial of this case had taken the question of the appellant's negligence from the jury it is not perceived how the ruling could be disturbed."

The judgment of the lower court was affirmed.

In Rudd v. Byrnes, 156 Cal. 636, 105 P. 957, 958, 26 L. R. A. (N. S.) 134, 20 Ann. Cas. 124, the court said:

"It appeared from plaintiff's testimony that on October 10, 1905, he, in company with the defendant and one Lima, went out along the Big river in Mendocino county to hunt deer. On the north bank of the river they parted company. Byrnes and Lima remained on the north side. The plaintiff, Rudd, crossed the stream, taking a dog with him. The dog started along a ridge and down through the brush into a flat across the river from Byrnes. Rudd thought the dog was after a deer, and ran in after. When he came out on the flat opposite Byrnes, he heard a shot and was struck by a bullet. There was no question of the fact that Byrnes fired this shot. His own testimony was that he saw an object moving in the brush, and fired at it, thinking it to be a deer. * * *

"That the defendant's conduct was negligent may well be conceded. 'As firearms are extraordinarily dangerous, a person who handles such a weapon is bound to use extraordinary care to prevent injury to others, and is held to strict accountability for a want of such care.' 12 Am. & Eng. Ency. of Law (2d Ed.) 518; Bahel v. Manning, 112 Mich. 24, 70 N. W. 327, 36 L. R. A. 523, 67 Am. St. Rep. 381; Judd v. Ballard, 66 Vt. 668, 30 A. 96; Moebus v. Becker, 46 N. J. Law, 41; Morgan v. Cox, 22 Mo. 373, 66 Am. Dec. 623. One who causes injury to another by discharging a firearm must, in order to excuse himself from liability, show that he was absolutely without fault. 12 Am. & Eng. Ency. of Law (2d Ed.) 519; Bahel v. Manning, supra; Morgan v. Cox, supra; Tally v. Ayres, 3 Sneed (Tenn.) 677; Wright v. Clark, 50 Vt. 130, 28 Am. Rep. 496. While the question of negligence is ordinarily one to be determined by the jury, yet where the facts are undisputed, and no inference but that of negligence can be drawn from them, the court may determine that negligence is shown as matter of law. Studer v. S. P. Co., 121 Cal. 400, 53 P. 942, 66 Am. St. Rep. 39; Nagle v. Cal. S. R. Co., 88 Cal. 86,

25 P. 1106. It is plain, from defendant's own story, that he did not, in this instance, exercise the care required of one handling firearms. He saw an object moving in the underbrush, and fired at it without taking time to discover whether it was a deer, as he supposed it to be, or a human being. There can be no room for doubt that, in so doing, he acted without that regard for the safety of others which is to be expected of one handling dangerous implements or substances."

However, the court remanded the case to the lower court in order that the jury might consider whether or not the plaintiff was guilty of contributory negligence.

We believe the reasoning of the courts in the above two cases particularly applicable here, because ordinary regard for the safety of human life and limb requires a hunter, before firing his gun at an object, to look carefully in order to see the unmistakable distinguishing characteristics between a human being and a deer or other animal. If his view is obscured by weather conditions and underbrush, he should refrain from shooting until he can see clearly. Requiring a hunter to withhold firing until he makes certain that he is shooting at game and not a human being might cause him to fail, on some occasions, to bag his game, but would likewise tend to prevent those who enjoy this line of sport from hastily and carelessly firing upon one of their companions or some member of the public. We conclude that the defendant was guilty of negligence.

Since we are of the opinion that a hunter must withhold firing until he can clearly observe parts of the anatomy of the animal which he intends to kill, it necessarily follows that the proximate cause of the accident, as a matter of law, was the negligence of the defendant in failing to do so. The plaintiff's alleged contributory negligence in leaving his stand before the hunt was over and wandering in the barricaded area was passive and not a contributing cause of the shooting.

However, even if we give the defendant the benefit of a consideration of the evidence with reference to the special defense of contributory negligence, the result is just the same. The evidence shows that, while there were definite rules to indicate that the hunt had been ended, the parties did not carefully observe them. We are not at all certain that on other occasions, when the parties hunted together, the shots were fired in connection with the blowing of the horn and that the captain of the hunt actually went to each stand for the purpose of bringing back all of

the members of the party, especially when they were not stationed far apart and could see one another. Furthermore, the evidence tends to show that at the time the plaintiff left his stand and wandered into the woods three of the other members of the party had gathered at the point where the Hammond highway intersects the Peavine road and two other members had begun to move from their stand in the same direction.

We do not believe that the plaintiff wandered in close proximity to the defendant's stand, because the evidence shows that approximately one minute after the horn was blown by Georges the defendant shot the plaintiff. While the plaintiff states that he had only moved 46½ feet from his post, by actual measurement, the defendant's witnesses estimate the distance from anywhere between 100 and 250 feet. We may say that it is conceded that the hunt was about to be called off at the time the plaintiff was injured. Under these circumstances, we do not believe that the plaintiff was guilty of negligence in concluding that the hunt had been called off and in going a reasonable distance from his stand to the point where he was shot.

■ As to the quantum of damages, the evidence shows that immediately after being shot plaintiff was removed from the scene and taken in the defendant's automobile to the Baptist Hospital, a distance of 65 miles, during which time he remained conscious and suffered excruciatingly both mentally and physically. The full load of nine buckshot entered from the left side of the buttocks and thigh, producing multiple gunshot wounds, consisting of nineteen punctures in the right lower lumbar region or back, the left buttock, the perineum (the area between the limbs), the scrotum, the left testicle and the penis, involving the urethra.

The left thigh, calf, and foot were very much enlarged, cold, and senseless to pain. He was in serious state of shock, and had lost considerable blood. It was necessary to administer opiates and antitetanus serum. He and the two doctors who treated him believed that he would not survive. He remained in the hospital from December 11, 1930, to January 31, 1931, during which time he was treated by Drs. Emmet Irwin and D. W. Bethea. His condition was so grave that it was necessary to employ special day and night nurses. From time to time several operations were performed for the purpose of removing infected parts and keeping the wounds open in order that they might properly heal. He was so ill at that time that it was

necessary to perform the operations in his room, not moving him from the bed. The doctors saw him several times daily; Dr. Irwin being in charge of the surgical end of the case and Dr. Bethea the medical end. At one stage of the treatment the doctors seriously considered amputating the left leg at the hip. Complications set in which caused serious disorders in his digestive system. He became anemic, developed a urinary infection and kidney trouble, all of which resulted from the traumatic injury. Dr. Bethea states that his kidneys have been permanently damaged and that plaintiff's life has been actually shortened as a result of the accident. He remained at home in bed from January 31, 1931, until February 19, 1931, under the constant attention of the doctors. He was then removed to the hospital, where he stayed about 12 days. On March 12, 1931, he attempted to resume his work as an engineer with the sewerage and water board. However, on February 15, 1932, his services were dispensed with due to disabilities resulting from his injury, which prevented him from performing his work. He was placed on a pension at one-half of his salary for a period of 4 years, after which time the pension will lapse. The pension fund is contingent upon certain collections. The patient was continually under the doctor's care until June, 1932. He is compelled to use a cane, and complained of difficulty in walking and pain even during the trial in October, 1932. There is a scar formation on plaintiff's penis which would tend to prohibit an erection, as the scarred tissue causes a distortion of the organ. Plaintiff, who was 54 years of age and married, testified that before the accident he was sexually normal, but since then he is incapable of having an erection and has lost his procreative powers. There is no evidence to the contrary.

We conclude, after a careful reading of the record, that the injuries suffered by Fowler were serious, painful, and permanent. This was the opinion of the trial judge, who had the benefit of seeing the plaintiff on several occasions, and we find nothing in the record to justify a contrary view. He awarded $10,000 for the physical injuries and suffering, and this includes $181 balance due the hospital; defendant having previously paid the nurses and the other part of the hospital bill amounting to more than $500.

■ Dr. Irwin testified that his bill for services, amounting to $2,650, is reasonable, and that he was employed by defendant to care for the plaintiff. The evidence shows that Dr. Irwin has filed a direct suit for this

amount against the defendant; consequently we believe that the ruling of the trial court in eliminating this item of damage in this suit was proper.

Dr. Bethea's bill amounting to $500 was also disallowed, as the doctor stated that, as the plaintiff was a friend of his, he had no intention of charging him, but that he would like to recover his fee from the defendant if he was held liable. As the plaintiff has not answered the appeal, we have no right to consider this item, as far as increasing the amount of the judgment is concerned. This latter reason would also apply to Dr. Irwin's bill.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.