271 So.2d 439 (1973)
Price SHURLEY
v.
S.T. HOSKINS.
No. 46763.
Supreme Court of Mississippi.
January 2, 1973.
*440 Statham & Watkins, Magnolia, for appellant.
Roach & McMillan, John Gordon Roach, Jr., McComb, for appellee.
RODGERS, Presiding Justice.
On or about April 8, 1969, Price E. Shurley of McComb, Mississippi, and S.T. "Red" Hoskins of the same city were hunting turkeys in Amite County, Mississippi, some eleven (11) miles south of McComb, Mississippi. The two men entered a wooded area some time prior to dawn and proceeded in a northerly direction along a fire-break for approximately three-eighths (3/8) of a mile. There the men separated; it was understood between them that S.T. "Red" Hoskins would proceed westerly to a spot which had been cleared for him by Mr. Shurley two days or so before April 8, 1969. Mr. Shurley proceeded easterly along an abandoned railroad dummy line past a waterhole and positioned himself a few feet from a firelane which ran in an east-west direction. The plaintiff sat down facing north, next to a pine tree.
Mr. Shurley took his position around 5:50 A.M. and proceeded to "putt" occasionally on a hen turkey call. Around 6:45 A.M. Mr. Shurley heard two hen turkeys in the distance toward the north and northeast and continued to call in an attempt to lure them closer hoping that a gobbler would be in the company of the hens.
Shortly before 7:00 A.M., Mr. Shurley glanced to his left toward the west and saw the defendant, Mr. Hoskins, slowly approaching toward the east along the firelane. Mr. Shurley motioned toward the defendant and was under the impression that Mr. Hoskins had seen him, and Mr. Shurley again turned toward the north and continued to "call" the turkeys.
Moments later Mr. Shurley looked back toward the direction of the defendant, Mr. Hoskins, and noticed that Mr. Hoskins had his automatic twelve gauge shotgun positioned at his shoulder and attempted to again wave to the defendant; but the defendant, Mr. Hoskins, discharged the firearm in the direction of the plaintiff, Mr. Shurley, and Mr. Shurley was permanently blinded from the discharge and impact of the shotgun. He also sustained other injuries including loss of teeth and disfigurement.
On February 11, 1970, the appellant filed a declaration in the Circuit Court of Pike County, Mississippi, against Mr. Hoskins in which he contended that the said Mr. Hoskins did on or about April 8, 1969, without cause or reason, negligently discharge his shotgun at the plaintiff while both were hunting turkeys. The declaration charged that as a result of the discharge of the defendant's firearm the plaintiff sustained serious and permanent injuries. He demanded judgment of and from the defendant in the amount of one hundred thousand dollars ($100,000.00) together with costs.
An answer was filed by the defendant on March 12, 1970, admitting that the parties were hunting and that the defendant discharged his shotgun but denied all of the remaining material allegations of the *441 declaration. The defendant further prayed that the declaration be dismissed and defendant discharged at the cost of the plaintiff. Subsequently, the defendant amended his answer by adding an affirmative defense, namely, that the plaintiff's injuries, if any, were caused by or contributed to by the plaintiff's negligence in that he positioned himself in the defendant's hunting area without the knowledge of the defendant and contrary to a previous understanding of the parties.
Trial was had on March 18, 1970, and a final judgment was rendered by the jury in favor of the defendant.
Appellee testified as follows:
"Q. As a matter of fact, you didn't see, you didn't see what you thought was a gobbler that morning, did you?
A. I absolutely saw what concerned me as two turkeys and a gobbler there, and so help me, before God and man, that's what I saw.
* * * * * *
Q. And you feel like, based on what you saw, that you say that you could see on that photograph, that you did that on that morning of April 8th?
A. I'm just as sure there were two turkeys there, and one of them was a gobbler, as I'm sitting in this seat, because the movement, and Price putting, if I had had any idea of that man being there, I would never have pulled the trigger, and I'll tell you that now. No sir, I would not have done it."
He further testified:
"Q. What is your understanding about safe hunting practices with reference to discharging a gun at a target before you are positive that you know what you are going to shoot at?
A. You are not supposed to shoot anything unless you know what you are shooting at.
Q. And yet on this morning of April 8th, 1969, you made certain in your own mind that this big hunk of man was not a human being but was a turkey gobbler?
A. The movements and the putts, Mr. Statham, gave me very positive proof in my own mind that there was two turkeys, and the third one, when that head went up, then is when I took my gun and shot.
* * * * * *
Q. But do hen turkeys raise their head, too?
A. Hen turkeys don't raise up much.
Q. But they do raise their heads, don't they?
A. Yea, yea.
Q. And you shot at a raised head, and you didn't know whether you were shooting at a hen, or a rooster, or a gobbler, or Price Shurley, did you?
A. Yes, sir, there is a difference in the heads on the turkeys.
Q. Did you see his beard?
A. I told you once, I didn't see no beard, I couldn't see no beard."
The appellant contended that there was an understanding that Hoskins would go to a place that had been cleared for the defendant two days previously and that he would not go beyond the little pond near the spot prepared for the defendant by Price Shurley. The defendant admits that the plaintiff had prepared a place for him but that he could not see from the spot; that he moved out a few feet so he would be in a position to observe the surrounding area. He also admits that the plaintiff told him not to go beyond the little pond, but he thought the reason for not going there was that the turkeys were in that direction and he would disturb them if he approached their roosting place before daylight. The defendant contends, however, that it was customary for the plaintiff and *442 defendant to get together after daylight and search for the place where the turkeys had been. He says he left the pond going toward the woods in the edge of a clearing where he expected to find the plaintiff.
The appellee testified that the appellant usually gave a partridge whistle and he would answer the call and that on this occasion the appellant Shurley did not whistle, and neither did the appellee. Shurley testified, however, that he motioned toward the appellee and he thought the appellee had seen him.
With this testimony before the court, the appellant's attorney made an effort to show that there was some difference between the sound of a live turkey call and that of an imitation turkey hen call made by a human, apparently so as to show that the appellee should have recognized that the turkey hen call was that of a hunter and not a live turkey or that of a gobbler turkey. The following colloquy appears in the record:
"BY MR. STATHAM:
As I understand it, this gentleman here said he heard a hen sound, and I wanted to know if it was the putt sound of a hen.
BY THE COURT:
Well, he said a hen sound, and there wasn't any gobbler sounds out there, by any of these witnesses.
BY MR. STATHAM:
I'm trying to demonstrate to the jury the fact that it was a human hen sound that the man heard, and not one of a hen turkey, and I merely want to ask the gentleman if the sound that he makes, with the instrument he makes it with, is that of a hen, or is it that of a human imitating a hen.
BY THE WITNESS:
A. It is that of a human imitating a hen turkey.
Q. Yes, sir. That's all.
BY THE COURT:
I don't think anybody said there was a hen turkey out there, was there?
BY MR. STATHAM:
I believe he did.
BY THE COURT:
He said he heard one.
BY MR. STATHAM:
He said he heard one, shot at one.
BY THE COURT:
They sound so much alike you can't tell them without you're good enough.
MR. STATHAM:
Yes, sir, I want, I don't want the Court commenting about it.
BY THE COURT:
What is that?
BY MR. STATHAM:
We don't want the Court commenting about what they sound like.
BY THE COURT:
Well, he's, he's good enough that I think he ...
BY THE WITNESS (Interposing):
Judge, if that's the case, a man better not call like a turkey, if he's going to be subject to somebody just shooting because he sounds like a hen turkey.
BY THE COURT:
Well, we're talking about calling turkeys now. All right."
During the trial the appellee permitted his emotions to get the upperhand. He wept copiously on the witness stand and said that "... before God and man, that's what I saw. * * * [I]f I had had any idea of that man being there, I would never have pulled the trigger, and *443 I'll tell you that now. No sir, I would not have done it." His emotional conduct very likely resulted in the jury's verdict of "not guilty by a majority vote."
After carefully examining the authorities in the record in this case, we are driven to the conclusion that the trial court should have sustained the motion of the plaintiff requesting the court to direct a verdict in favor of the plaintiff as to liability.
One of the defenses raised by the appellee is that the appellant assumed the risk of being shot since he, the appellant, was in a place other than where the appellee thought the appellant should have been in accordance with the understanding he, the appellee, thought that they had earlier in the morning. It is the appellee's contention that the appellant's mere participation in the turkey hunt is tantamount to an acquiescence in and acceptance of any and all risks attendant to the discharge of a dangerous weapon by a nearby hunter. However, such a viewpoint is not representative of the law on assumption of risk as this Court interprets it. Since the defense of assumption of risk has traditionally been a confusing and a controversial doctrine, it is proper for this Court to clarify its stand on the extent of this doctrine's application as to hunters in Mississippi.
Broadly speaking:
"... [A]ssumption of risk means that the plaintiff, in advance, has given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone." Prosser, Handbook of the Law of Torts, 4th Ed., § 68, p. 440 (1971).
Quite often, there is a tendency on the part of some practitioners and jurists to confuse assumption of risk with the doctrine of contributory negligence. It should, however, be pointed out that these two doctrines are separate, distinct, and not to be mistaken for one another. Assumption of risk involves a mental state of willingness to deliberately venture forth into a situation containing dangers which are fully known and appreciated by the plaintiff (or so obvious that they must be presumed to have been readily calculable by the plaintiff). On the other hand, contributory negligence implies the absence of a deliberate choice and an intelligent realization of the risk presented by a given situation, and further, it suggests that the plaintiff's failure to exercise the care reasonably necessary to ascertain the dangers involved in a given situation was a proximate cause of the damages sustained by the plaintiff. 57 Am.Jur.2d, Negligence, § 278, pp. 669-672 (1971).
"The defense of assumption of risk presupposes (1) that the plaintiff had some actual knowledge of the danger; (2) that he understood and appreciated the risk therefrom, and (3) that he voluntarily exposed himself to such risk. Therefore, except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character, or the danger involved, including the magnitude thereof, and voluntarily accepts the risk." 57 Am.Jur.2d, Negligence, § 281, p. 674 (1971).
An examination of the facts in this case reveals quite clearly that the elements of the assumption of risk doctrine are not present, and thus, this defense cannot be applied to benefit the appellee. In addition, there is a considerable public interest to be served in examining the reasonableness of the conduct of the defendant in discharging his weapon. To apply the assumption of risk doctrine because of the negligence of the plaintiff without regard to the degree of care exercised by the defendant would, in many instances, be equivalent to barring the plaintiff's recovery in cases where the defendant was negligent *444 or exercised a degree of care inferior to that required by law. The maintenance of safe hunting practices demands that the duty of extraordinary care imposed on a hunter's discharging a firearm be not abrogated or diminished by the imposition of what is, under the circumstances presented in this case, an inaptly transplanted defense. In short, a member of a hunting party does not assume the risk that one of his fellow hunters will negligently discharge his firearm. Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1, 5 A.L.R.2d 91 (1948).
In the absence of the availability of the assumption of risk defense, the actions of the defendant must be examined in light of the standards of care imposed on hunters using firearms. The general rule states:
"... [T]he standard of care generally imposed upon a hunter is the duty to exercise ordinary care commensurate with the peculiar circumstances of each case." 26 A.L.R.3d 561, 567 (1969). See also Schweitzer, Trial Manual for Negligence Actions, 2d ed., § 154, p. 404 (1941).
The phrase "ordinary care under the circumstances" has frequently been interpreted as follows:
"Owing to the dangers attendant upon the use of firearms, the ordinary care he (the defendant) was bound to exercise was a very high degree of care." (Parenthesis added) McLaughlin v. Marlatt, 296 Mo. 656, 672, 246 S.W. 548, 553 (1922).
Or, stated another way:
"The care enjoined upon one handling a loaded firearm is variously defined by the courts as ordinary care and the highest degree of care. Whichever degree of care is enjoined upon one handling a loaded gun it is obvious that even ordinary care requires extreme caution at all times to avoid the discharge of the gun and injury to another." Huber v. Collins, 50 N.E.2d 906, 908 (Ohio App. 1942). See also Bezemek v. Crystal, 27 Mich. App. 36, 183 N.W.2d 414, 416 (1970).
In State v. Cunningham, 107 Miss. 140, 65 So. 115 (1914), this Court simply, yet forcefully, observed:
"The highest degree of care is exacted of a person handling firearms. They are extraordinarily dangerous, and in using them extraordinary care should be exercised to prevent injury to others." 107 Miss. at 152, 65 So. at 118. Also quoted in Roberts v. Williams, 302 F. Supp. 972, 986 (D.C.Miss. 1969).
See also Rudd v. Byrnes, 156 Cal. 636, 105 P. 957 (1909); Normand v. Normand, 65 So.2d 914 (La. App. 1953); Finley v. Brickman, 186 Neb. 747, 186 N.W.2d 111 (1971).
It is also true under the general law of negligence, that the degree of care required of one increases with the degree of danger involved. Where one is hunting with a gun in an area covered with underbrush, and other people are known to be, or likely to be, in the area, who are likely to be attempting to conceal themselves, a hunter is charged with extraordinary care in the use of a dangerous firearm. Under the general law of negligence, a person is presumed to have seen that which he should have seen by the use of ordinary care,[1] but before one is permitted to fire a dangerous weapon at a target, he must use extraordinary care to see and determine that the target is not a human being.
We now hold that the use of a deadly weapon requires that one should use such weapon with extraordinary care so as not to injure another by the use of this dangerous agency.
Returning to the facts in the instant case, the defendant admits that he left his place or stand prepared for him by the plaintiff, and went in search of the plaintiff. He knew the plaintiff was somewhere *445 in the direction he was going, and he knew that the plaintiff was calling turkeys with a turkey caller. The defendant also stated in his testimony that he knew that "You're not supposed to shoot anything unless you know what you are shooting at." Nonetheless, the defendant fired his shotgun at what he said he was sure were two hens and a gobbler; but, was in fact the plaintiff, Price Shurley.
In Fowler v. Monteleone, 153 So. 490 (La. App. 1934) it was said that:
"... [O]rdinary regard for the safety of human life and limb requires a hunter, before firing his gun at an object, to look carefully in order to see the unmistakable distinguishing characteristics between a human being and a deer or other animal.... [H]e (the hunter) should refrain from shooting until he can see clearly." (Parenthesis added) 153 So. 490 at 494.
Additional authority for this proposition is contained in Webster v. Seavey, 83 N.H. 60, 138 A. 541 (1927) in which the Court stated:
"One who goes gunning may not reasonably anticipate that a man in the woods will in fact be met, but by reason of the risk that one may be, he is called upon to do what is reasonably required to identify the object before he fires at it. One who hears a rustling and sees the bushes move may not reasonably anticipate that the cause of such rustle in and moving of the bushes is a man instead of a deer, but by reason of the risk that it may be a man instead of a deer, he is called upon to do what is reasonably required to find out." 138 A. 541 at 543.
Under the facts presented in this case, the defendant thought he saw and heard turkeys moving about and "putting" in the bushes. Nonetheless, when there were in fact no turkeys, but instead, only the plaintiff was present at the scene of the shooting, it must be stated that the defendant while charged with the extraordinary degree of care incumbent upon those individuals about to discharge a weapon in an area known to contain a fellow hunter, should have seen the plaintiff. There can be no doubt, then, that the defendant's failure to recognize the plaintiff was a mistake arising out of his failure to exercise the requisite extraordinary degree of care imposed upon those who discharge firearms.
Under these circumstances, the trial court should have sustained the plaintiff's motion for a directed verdict as to the defendant's liability. We, therefore, sustain the plaintiff's motion and reverse the judgment so that the question of comparative negligence can be considered by a new jury. Damages awarded to the plaintiff may be reduced in proportion to any negligence found by the jury to have been contributed by the plaintiff toward his own injuries. See Section 1454, Mississippi Code 1942 Annotated (1956).
The other alleged errors said to have been committed will not occur upon the retrial of this case, and for that reason, we do not discuss them.
Reversed and remanded.
PATTERSON, SMITH, SUGG and BROOM, JJ., concur.
NOTES
[1] Graves v. Johnson, 179 Miss. 465, 480, 176 So. 256, 260 (1937); see also Kettle v. Musser's Potato Chips, Inc., 249 Miss. 212, 234, 162 So.2d 243, 250 (1964).