Amber Nicole LEE, et al., Appellants,

v.

William I. HARTWIG, Respondent.

No. WD 45198.

Missouri Court of Appeals,
Western District.

Dec. 22, 1992.

Application for Transfer Sustained
Dec. 22, 1992.

Case Retransferred March 23, 1993.

Court of Appeals Opinion Readopted
March 26, 1993.

J. Kirk Rahm, Rahm, Rahm & Koenig, P.C., Warrensburg, Michael W. Manners and P. Kevin Blackwell, Paden, Welch, Martin & Albano, P.C., Independence, for appellants.

Andrew H. McCue, Campbell, Holt & McCue, Kansas City, for respondent.

Before LOWENSTEIN, C.J., and BERREY and SMART, JJ.

SMART, Judge.

This wrongful death action concerns the shotgun-blast death of Larry Lee, who was mistaken for game by his neighbor while both were hunting for turkeys in a wooded area in Carroll County. Family members of Mr. Lee sued William Hartwig, contending Mr. Hartwig negligently killed Mr. Lee. Following a trial, the jury found neither the deceased nor Mr. Hartwig were at fault, assessing zero percent fault to both. The family of Mr. Lee appeals, contending that the court erred in failing to direct a verdict for plaintiffs, and in unduly restricting the cross-examination of defendant's expert. Judgment affirmed.

William Hartwig went hunting early on the morning of October 14, 1985, on wooded land in Carroll County. He was hunting alone. Mr. Hartwig set out a decoy and was sitting on the ground with his back against a tree, calling for turkeys. Mr. Hartwig testified that he heard what he thought was a turkey calling in response to his call. The sound seemed to be behind him and to his left. When asked about his actions upon believing a turkey was nearby, he responded: "I raised up real slow, and I turned around, and that's when I saw what was in my mind a turkey, and that's when I shot." He described his perception as follows: "Well, in my mind what I saw was like a turkey's head, kind of greenish-blue, and maybe a little black, and I just thought it was a turkey." He said he saw the object "bob" at least twice, slowly. Describing his conduct later in his testimony, he said, "I seen this object move two or three times, so I flipped off the safety and shot it." On cross-examination he said, "when I turned around, I was looking for movement ... when it bobbed like a turkey a couple of times or more, and when it went down, I did shoot." His pre-trial deposition included the following statement (received in evidence at trial): "When I got ready to shoot, I was sitting on the ground, and I scooted up and had my back against that tree, and I scooted up against that tree, and in one motion I turned around and looked and seen what I thought in my mind was a turkey, and I fired."

When Mr. Hartwig went to find his game, he found the body of Larry Lee on the ground. Mr. Lee had received a shotgun blast in the back, shoulder, head, and side of the face. Mr. Lee's body was approximately 55 feet from where Mr. Hartwig had discharged his weapon. Mr. Lee was either already dead, or expired shortly thereafter while Mr. Hartwig was attempting to get help.

### The cross-examination of defendant's expert

Plaintiffs contend on appeal that the trial court erred by unduly restricting counsel for plaintiffs from cross-examining defendant's expert witness as to opinions previously expressed by said expert in his deposition testimony. In a pre-trial deposition, the hunting safety expert witness of defendant Hartwig acknowledged on cross-examination that Hartwig was "negligent" in firing his gun "without properly identifying his target."

During his testimony at trial, the expert, Mr. Staton, testified that turkey hunting is considered the most dangerous hunting sport in the United States. Turkeys tend to like areas of thick timber. Turkey hunters generally wear camouflage clothing and hunters often duplicate the sounds made by turkeys. "Hunter orange" has not generally been worn by turkey hunters because turkeys are not color blind (as are some other types of game) and the bright colors may make it more difficult to attract turkeys.

Mr. Staton testified that it would be "wrong" for Mr. Hartwig to have identified a turkey by sound, color or movement. He stated that a safety rule dictates that the hunter must be sure of his target before he pulls the trigger. The hunter should never allow excitement to affect his behavior. He was asked to express an opinion as to whether William Hartwig exercised the care that "a very prudent turkey hunter would have exercised under the same or similar circumstances," assuming, for purposes of the question, that Mr. Hartwig "saw a dark peaked, what he believed to be a turkey head, bobbing up and down at least twice, at the time he fired." Mr. Staton stated that if Mr. Hartwig had heard a sound, or had seen a color, or had seen movement of a bush, and had fired only on the basis of any of those things, Mr. Hartwig would clearly have failed to exercise the care that a "very prudent" turkey hunter would have exercised. However, said Mr. Staton, if the question required him to assume that Mr. Hartwig believed that he actually saw a turkey, and then fired, he could not say whether or not the degree of care exercised by Hartwig was appropriate.

On cross-examination, Mr. Staton acknowledged that one of the "Ten Commandments of Firearm Safety" which he teaches is the commandment to "be sure of your target before you pull the trigger." Mr. Staton further acknowledged that Mr. Hartwig violated that commandment. Plaintiff's counsel then asked Mr. Staton whether Mr. Hartwig was "negligent" by violating the commandment to be sure of one's target. The court sustained an objection that plaintiffs' question was "calling for a legal conclusion that is in the language of the court."

Plaintiffs contend it was error for the court to restrict the questioning on cross-examination because plaintiffs were entitled under § 490.065, RSMo Supp.1991 to elicit an opinion from the expert as to whether Hartwig was "negligent." Defendant contends that the trial court properly sustained the objection because the question improperly called for a legal conclusion.

■■■ Section 490.065 provides that testimony by an expert witness "is not objectionable because it embraces an ultimate issue to be decided by the trier of facts." This statute clearly allows an expert to testify as to his opinion concerning an ultimate issue, such as whether a party was negligent. The term "negligence" should be defined in the questioning so that it can be ascertained whether the standard for determining "negligence" which is used by the expert is the same standard to be applied by the jury under the instructions of the court. When the legal term "negligence" is defined in accordance with the applicable jury instruction, the legal issue of negligence becomes an ultimate fact issue for the trier of fact. Expert testimony is not admissible on issues of law. *Young v. Wheelock*, 333 Mo. 992, 64 S.W.2d 950, 957 (1933); 7 *Wigmore, Evidence* § 1952 (Chadbourn rev. 1978). Under § 490.065, testimony on ultimate fact issues is admissible for the guidance of the jury in their fact finding mission. Neither juries nor expert witnesses are permitted to manufacture their own definitions of operative legal terms. Those definitions are provided by the law.

We are mindful § 490.065 permits an expert to give testimony in opinion form. However, the opinion must be based upon the established standard of care and not upon a personal standard. The question must be phrased as to leave no doubt that the expert is basing the opinion on well recognized standards.

*Dine v. Williams,* 830 S.W.2d 453, 457 (Mo.App.1992). Here, plaintiffs' counsel did not provide the definition of the word "negligence" in the immediate context of the question.[1] While Mr. Staton may have understood the definition of "negligence" which he was to apply in answering the question, the jury might well not have. Reasonable discretion must be allowed to the trial judge in determining whether adequate definition of an operative legal term has been provided. The trial judge is in the best position to determine the risk that the jury will be confused. It was not an abuse of discretion to sustain the objection, in view of the failure of either party to define the term "negligence." The question was phrased in terms of "inadequately explored legal criteria." 1 *McCormick, Evidence* § 12, at 50–51 (4th ed. 1992). Plaintiffs suggest on appeal that the lack of legal criteria is solved by the fact that the court, in the jury instructions, defines the term negligence. This misses the point. Without a definition of negligence supplied *in the context of the particular question and answer,* the jury may not be able to know what the witness means by the word "negligence," although it may later find out what the court means by that term.

Plaintiffs further contend that the court should have allowed them to pursue this line of questioning because the questioning was designed to impeach Mr. Staton by showing prior inconsistent statements in his deposition testimony, in which Mr. Staton appeared to acknowledge that Mr. Hartwig was "negligent." Since Mr. Staton testified on direct that he did not have an opinion as to whether Hartwig exercised the "care that a very prudent turkey hunter would have exercised under the circumstances," plaintiffs would have been entitled to ask about the apparently contradictory deposition testimony had the proper foundation been laid. The fact that neither Staton nor plaintiffs' counsel, at the time of Staton's deposition testimony, defined the word "negligence" (nor was there an objection at that time on the basis of lack of definition) would not prohibit its use where the definition intended by Staton can be explored in his court testimony, and can be compared to the legal definition. However, plaintiff did not lay the proper foundation for impeachment by prior inconsistent statement.

> The foundation to be laid requires that the witness first be asked whether he made the prior statement, quoting it and the precise circumstances under which it was made. If the witness admits making the statement, he stands impeached. If the witness denies or equivocates about having made the statement, the examiner may then introduce evidence showing the witness did make the prior inconsistent statement.

*Engelbert v. Flanders,* 670 S.W.2d 19, 21 (Mo.App.1984). Here, plaintiffs' counsel did not lay the required foundation to impeach Mr. Staton with his deposition testimony. He did not confront Mr. Staton with the deposition testimony to give Mr. Staton a chance to admit, deny or explain any apparent conflict in the statements. Moreover, as far as the record reveals, the trial judge had no clue as to Mr. Staton's deposition acknowledgement that Hartwig was "negligent." Plaintiffs cannot attribute error to the trial judge for restricting their impeachment of the witness when the deposition testimony was not called to the attention of the trial court until much later in the trial, quite some time after the witness had been excused. Had the fact that the questioning was really designed to get at the apparent contradiction in Staton's deposition testimony been brought to the court's attention in timely fashion, most likely the court would have allowed counsel latitude to explore the apparent inconsistency. However, an offer of proof made

---

**1.** It could be argued that the context was already established on direct examination when Staton was asked about "the degree of care a very prudent turkey hunter would have exercised" under similar circumstances. Yet the problem is that this standard of care was never, in either direct or cross, tied to the word "negli- gence," so that the jury could know that the two were equivalent. Of course, instead of using the word negligence, counsel on cross-examination could have used the same terms used by defendant on direct ("very prudent turkey hunter"), without having to use the word negligence at all.

after the witness is excused will not be sufficient to charge the court with error because the only remedy available to the court would have been to allow recall of a witness already excused. *Cf. Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983). Therefore, this court concludes that the trial court did not err in sustaining the objections of the defendant.

### The denial of the motion of plaintiffs for a directed verdict

Plaintiffs' next contention is that the trial court erred in failing to grant judgment for plaintiffs on the issue of liability notwithstanding the verdict of the jury. Plaintiffs argue that the evidence establishes that defendant discharged his weapon without adequately identifying his target, and that such action constituted a failure to exercise a very high degree of care as a matter of law, so that plaintiffs were entitled to a directed verdict on the issue of liability.

■ Appellate court review of a denied directed verdict motion is a question of law. *Fricke v. Valley Production Credit Association*, 721 S.W.2d 747, 752 (Mo.App. 1986). A trial court should grant a directed verdict only if "reasonable persons would not differ on the correct disposition of the case." *Broeker v. Haid*, 786 S.W.2d 615, 616 (Mo.App.1990). Directed verdicts in favor of the parties bearing the burden of proof are not favored, and are considered drastic. *Bank of Brookfield v. Burns*, 724 S.W.2d 262, 264 (Mo.App.1986). However, a directed verdict motion may be granted against a defendant when he "admits in pleadings, by counsel, or in individual testimony to the truth of the basic facts supporting the plaintiff's claim." *Id.*

■ In a negligence action, defendant is generally held to an ordinary care standard. However, when dealing with firearms, the care required by defendant is a very high degree of care. *White v. Bunn*, 346 Mo. 1112, 145 S.W.2d 138, 140 (1940); *McLaughlin v. Marlatt*, 296 Mo. 656, 246 S.W. 548, 553 (1922); *Atchison v. Procise*, 24 S.W.2d 187, 190 (Mo.App.1930). The manifest importance of a very high degree of care in hunting has been stated as follows:

> ordinary regard for the safety of human life and limb requires a hunter, before firing his gun at an object, to look carefully in order to see the unmistakable distinguishing characteristics between a human being and a deer or other animal. If his view is obscured by weather conditions and underbrush, he should refrain from shooting until he can see clearly. Requiring a hunter to withhold firing until he makes certain that he is shooting at game and not a human being might cause him to fail, on some occasions, to bag his game, but would likewise tend to prevent those who enjoy this line of sport from hastily and carelessly firing upon one of their companions or some member of the public.

*Fowler v. Monteleone*, 153 So. 490, 494 (La.App.1934).

■ The question is whether a hunter who mistakes another person for game, and fires upon such person, is presumed negligent as a matter of law. Some jurisdictions have held a shooter liable as a matter of law for misperception of the targeted object even though the shooter thought he was firing at game and did not admit lack of care. *Green v. Hagele*, 182 Mont. 155, 595 P.2d 1159 (1979); *Watson v. State Farm*, 469 So.2d 967 (La.1985). These jurisdictions have, in effect, adopted a form of strict liability for hunting accidents in which a human is mistaken for game. Other jurisdictions are inclined to allow such cases to go to the jury. *E.g., Hendricks v. Broderick*, 284 N.W.2d 209 (Iowa 1979). We have not been asked by appellants in this case to adopt a rule of strict liability for an accident of this type. Therefore, we examine Missouri law as we believe it currently stands. Missouri appears to be one of the jurisdictions inclined to leave the matter with the jury where the defendant does not concede facts clearly amounting to liability. In *McLaughlin v. Marlatt*, 296 Mo. 656, 246 S.W. 548, 551 (1922), the defendant shooter, who was hunting for foxes, fired into tall grass

when his companion stated, "it is a fox, shoot." The shooter said "I supposed it was [a fox] when I saw the grass shaking, and I shot." *Id.* Unfortunately, the defendant was actually firing upon a 16 year old neighbor boy who was in the grass. The court held that the issue of defendant's lack of care was for the jury. The court in that case regarded the companion's suggestion as a circumstance that the jury "might well take into consideration with all the other facts" in passing on the issue of defendant's negligence. *Id.* 246 S.W. at 554.[2]

In this case, in the absence of a rule of strict liability, *McLaughlin* suggests that we can only affirm. Here we do not have anyone suggesting to Hartwig that there was a turkey in the foliage. Instead, we have Hartwig saying that he thought he saw a turkey head "bobbing." It does not seem that it could be said that Hartwig was more blameworthy because he relied upon his own poor perception rather than upon someone else's poor perception. Unless Hartwig's testimony somehow amounts to an admission of liability, this court cannot find error in the trial court's decision to allow the issue to go to the jury.

In order for a defendant's testimony to constitute an admission upon which liability could hang, it must clearly and unequivocally admit facts which bind defendant inescapably to liability as a matter of law. *Johnson v. Bush*, 418 S.W.2d 601, 607 (Mo.App.1967). Implicit in Hartwig's testimony is the assertion that he was attempting to make certain that the object he saw was a turkey, and that he

fired only after believing that he "saw" a turkey. It is possible that the jury could have rejected Hartwig's testimony that he thought he saw a turkey head bobbing. The jury could have decided that Hartwig merely fired at moving foliage, which would constitute negligence. *McLaughlin*, 246 S.W. 548 (Mo.1922). However, the verdict indicates that the jury believed Hartwig. This court has no right to reject the jury's evaluation of Hartwig's credibility. *Elliott v. Wescoat*, 336 S.W.2d 649 (Mo. 1960).

Although there was no physical evidence that anything about Larry Lee or anything near Larry Lee gave the appearance of a turkey head, that does not mean that the jury could not infer, based upon Hartwig's testimony, that there was something which actually gave that appearance (and that we simply do not know what that object was). The question then arises whether or not the act of firing at a bobbing turkey's head in the woods, without seeing the entire turkey, or at least more than a head, would constitute a departure from the exercise of a very high degree of care. The record in this case fails to establish that such action would constitute negligence as a matter of law. While there may be authority to the effect that a hunter should make sure he is able to clearly see the entire bird before firing, no evidence of such a standard was introduced in this case.[3] Consequently, this court, in reviewing Hartwig's testimony, must take into account the possibility that the jury believed Hartwig's testimony that, when he looked in Larry Lee's direction, he actually saw something which

---

**2.** In *McLaughlin,* the contention of appellant was that the defendant (and not the plaintiff) was entitled to a directed verdict. Therefore, the holding of *McLaughlin* is less authoritative for this case than if the plaintiff had been the appellant on that issue. Nevertheless, the court's comments show a commitment to leave the issue with the jury. Also, *McLaughlin* is very consistent with the overall reluctance of Missouri courts to direct a verdict for the plaintiff in a tort case. *E.g., Schaefer v. Accardi,* 315 S.W.2d 230 (Mo.1958) (defendant driver admitted skidding and striking plaintiff's car—which was stopped in traffic—and offered no justification for striking plaintiff's car—court regarded issue of negligence as a matter for the jury).

**3.** The safety rules generally require that the hunter be "sure" of his target. In this case, that concept was not developed beyond the idea that the hunter should not fire merely at movement, or color, or sound. According to the testimony of the expert witness in this case, the concept of being *sure* of one's target is not a sentiment of the hunting community that the shooter should be held to the standard of a guarantor of the accuracy of his/her perception. Rather, it seems to be a standard requiring that one be sure "in one's own mind" that the object being fired upon is game.

gave such a close resemblance to a turkey head that even a person exercising a very high degree of care would have been fooled. The jury could have reached such a conclusion under the evidence. Consequently, we cannot find his testimony to be an admission of liability.

We must give Hartwig's testimony the benefit of every possible inference opposing the granting of a directed verdict for plaintiffs. We also are not permitted to weigh the evidence. Where the question of the weight of the evidence has been raised in plaintiffs' motion for new trial and ruled adversely to plaintiffs, that is the end of the matter. *Robbins v. Robbins*, 328 S.W.2d 552 (Mo.1959). Here, the trial judge did not find the verdict to be against the weight of the evidence. Consequently, it is only by finding Hartwig's testimony to be a testimonial admission of a failure to use a very high degree of care that we have authority to disturb this verdict. *Bank of Brookfield v. Burns*, 724 S.W.2d 262, 264 (Mo.App.1986). As already discussed, Hartwig's testimony falls short of constituting an admission of negligence, at least upon the record in this case. The trial court cannot be convicted of error in allowing the issue of negligence to go to the jury.

The judgment is affirmed.

All concur.